INTERNATIONAL PAPER
COMPANY, Plaintiff,

v.

Mark A. SUWYN and Louisiana–Pacific
Corporation, Defendants.

No. 96 Civ. 0143 (BDP).

United States District Court,
S.D. New York.

June 19, 1997.

Joseph S. Allerhand, Weil, Gotshal & Manges LLP, New York City, for plaintiff.

Ellen R. Nadler, Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PARKER, District Judge.

On January 2, 1996, Mark A. Suwyn ("Suwyn") resigned as Executive Vice President of International Paper Company's ("International Paper") forest and specialty products division. That same day he assumed new responsibilities as Chairman and Chief Executive Officer ("CEO") of Louisiana–Pacific Corporation ("Louisiana–Pacific"). Alleging that this move violated a noncompetition agreement ("the Agreement" or "the Non-compete") Suwyn had signed in July 1995, International Paper brought this action seeking to enforce the Agreement.

International Paper's primary contention is that the Agreement executed by Suwyn barred him from joining Louisiana–Pacific, a competitor, for eighteen months after his departure from International Paper. Suwyn, in turn, claims that under the Agreement, he was precluded, for that period, only from working for major companies that competed with International Paper's paper division, as well as certain specified companies. According to Suwyn, Louisiana–Pacific falls into neither of those two categories, and therefore his employment by Louisiana–Pacific did not therefore violate the Agreement.

I find this to be one of the rare cases in which the parties to an ambiguous contract had such fundamentally different meanings in mind when they ostensibly executed their agreement that no contract was formed. Moreover, even assuming that a valid contract exists, International Paper failed to establish the likelihood of irreparable injury necessary for the injunctive relief sought. *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). The matter was tried to this Court from

April 7 through 14, 1997. The Court's Findings of Facts and Conclusions of Law follow.

### *Introduction*

International Paper has sued Mark Suwyn, one of its former Executive Vice Presidents and the current Chairman and CEO of Louisiana–Pacific, alleging that he breached his Noncompete so that he could fulfill his long-held ambition of becoming a CEO of a Fortune 500 company.

International Paper Company is a multinational forest products and paper company. In 1995, International Paper ranked thirty-nine on the Fortune 500 list of industrial companies. In 1995, its gross revenues totaled approximately $20 billion. Its five areas of operation include (1) printing papers, (2) packaging, (3) forest products, (4) distribution of paper products, industrial products and graphic arts supplies, and (5) speciality products such as facings and laminates for the construction and furniture industry. Of those areas of operation, International Paper's printing papers division generates the largest percentage of the company's net sales.[1]

Louisiana-Pacific was formed in 1992 when it was "spun off" from Georgia–Pacific as a separate company. Like International Paper, Louisiana–Pacific is a Fortune 500 company. Its 1995 net sales totaled approximately $2.8 billion. In contrast to International Paper, Louisiana–Pacific does not manufacture paper but derives most of its income from building products.[2] In 1994, for example, of Louisiana–Pacific's $3.1 billion in total sales, approximately 93% came from building products. In 1995 and 1996, revenue from building products constituted 89.2% and 93%, respectively, of Louisiana Pacific's gross sales.

From January 1992 to January 1996, Mark Suwyn was Executive Vice President in charge of International Paper's forest and speciality products division. In 1994, forest and speciality products accounted for approximately $1.6 billion, or 10%, of International Paper's total sales for that year. Though generating a smaller percentage of International Paper's total net sales than the company's paper division, the forest and specialty products division was still a significant component of the company.

Prior to joining International Paper, Suwyn had spent virtually his entire career—twenty-five years—at E.I. DuPont de Nemours ("DuPont") where he worked with John Georges ("Georges"). In 1979, Georges left DuPont to become executive vice president of International Paper's wood products division and in late 1984, he became International Paper's CEO and in early 1985, its chairman. Beginning in early 1991, Georges, who regarded Suwyn as a capable and talented manager who had risen rapidly at DuPont, endeavored to recruit Suwyn. Although Suwyn would eventually find himself in the position of an International Paper executive vice president, he initially was not interested in leaving DuPont. It was during the course of these early conversations that Georges first learned of Suwyn's ambition to one day become chief executive officer of a major company.

In 1992, Georges, facing the pending resignation of an executive vice president, again approached Suwyn about joining International Paper. Suwyn, by this time, was willing to reconsider leaving DuPont, but told Georges that he would only move to International Paper if it afforded him some realistic opportunity of succeeding Georges as the company's CEO. Georges, in response, told Suwyn that he could be a viable candidate and had reasonable prospects of positioning himself as Georges's successor. He further stated, however, that there would be other candidates for the position and that it was too early to discuss meaningfully the issue of Georges's succession. Suwyn, also communicated his desire to be named to International Paper's Board of Directors ("the Board") should he move there. Two other executive vice presidents who stood as potential successors of Georges were Board members.

---

1. For example, between 1994 and 1996 the sale of printing papers generated between 26 and 29% of International Paper's net sales.

2. Building products, as defined by Louisiana-Pacific, include structural panel products, lumber and industrial panel products.

Georges told Suwyn that he would have ample exposure to the Board but Georges was unwilling, at that time, to commit to Suwyn's membership.

Suwyn was offered employment by International Paper in January 1992. In a January 30, 1992 letter setting forth the terms of his employment, International Paper agreed that during his tenure at International Paper, Suwyn would be eligible to participate in various executive compensation programs provided for in International Paper's Long–Term Incentive Compensation Plan ("LTICP"). The January 30 Employment Letter also provided that Suwyn would be eligible to participate in International Paper's Management Incentive Plan as well as its Performance Share Award and Executive Continuity Award Programs.

The negotiations surrounding Suwyn's employment were finalized in February 1992 and Suwyn commenced employment with International Paper as Executive Vice President for Forest and Speciality Products on March 1, 1992. Although Suwyn was not asked to sign a noncompetition agreement as a condition to joining International Paper, he was required to sign a confidentiality agreement which broadly proscribed disclosure of any confidential or proprietary information obtained while he was employed at International Paper. Approximately 8,700 International Paper employees, including 700 of its most senior executives were also required to execute similar confidentiality agreements.

As International Paper's Executive Vice President for Forest and Speciality Products, Suwyn had oversight responsibility for, among other things, International Paper's masonite building products, decorative products, imaging products, veratec non-wovens, chemical business, as well as Resource Net International, a large paper distribution business which purchased paper from outside sources for resale. In 1995, these business generated approximately $8 billion in revenue, of which approximately $4.5 billion was attributable to Resource Net.

In 1993 and 1994, International Paper was stung by the defections of several high-level executives. Dana Meade, Executive Vice President of the printing papers division and a member of the Board, left to become CEO of Tenneco, Inc., an international conglomerate. Other key executives left International Paper to work for Weyerhaeuser Company, Union Camp Corporation, and James River Corporation—all companies that Georges considered to be International Paper's competitors. Georges felt strongly about the inequity of senior executives, who had benefited from the training, support, and experience they received at International Paper, bestowing those benefits on other companies.

In late 1993 or early 1994, in an effort to combat this problem, Georges decided to implement a policy requiring select employees to execute noncompetition agreements. The early versions of the agreements were quite broad. They were triggered, for example, even if an employee was discharged without cause, and they required their signatories to concede the reasonableness of the agreement. As a result, these preliminary drafts were met with considerable opposition.

Eventually, the more objectionable features were dropped and by April 1994, a form noncompetition agreement was developed and circulated to targeted executives for signature. The form noncompete, which was identical to the Agreement proffered to Suwyn for execution provided, in part:

## C. *Non-Compete Provisions*

4. (a) While an employee of International Paper, I agree not to compete in any manner, either directly or indirectly, whether for compensation or otherwise, with International Paper, or to assist any other person or entity to compete with International Paper.

(b) After the termination of my employment for any reason except involuntary termination without cause, I agree that for a period of eighteen (18) months following such termination I will not compete with International Paper either:

(i) by producing, developing or marketing, or assisting others to produce, develop or market, or

(ii) by accepting employment from or having any other relationship (including, without limitation, through owning, man-

aging, operating, controlling or consulting) with any entity which produces, develops or markets,

a product, process, or service which is competitive with those products, processes, or services of International Paper, whether existing or planned for the future, on which I have worked, or concerning which I have in any manner acquired knowledge of or had access to Protected Information, during the five (5) years preceding termination of my employment. The foregoing restrictions shall apply to all geographical areas where I performed services for International Paper prior to such termination and to all other places where International Paper does business and/or did business during the term of my employment.

The Agreement as presented for signature would, thus, have restricted its signatories from leaving and, for eighteen months, joining any company that competed with International Paper or produced a product that competed with any product International Paper made. In view of International Paper's position as a world-wide Fortune 500 company, the Agreement was—and was intended to be—extremely broad.

Although signing the Agreement was not an explicit condition to continued employment, failure to do so would result in significant financial penalties. Any executive who was asked but refused to sign was precluded from receiving further incentive compensation awards under International Paper's LTICP pursuant to which stock options, which formed a significant component of executive compensation, were granted. For a senior executive at International Paper, refusal to sign would, as a practical matter, have ended his or her career at the company.

For Suwyn, who had long harbored the ambition of becoming the CEO of a major company, the introduction of the Agreement posed a major dilemma. Georges, by mid–1994, was approaching retirement but had not selected a successor. Although the forest and speciality products division had enjoyed considerable success under Suwyn's direction, it was far from clear that Suwyn would succeed Georges. Suwyn still had not been appointed to International Paper's

Board, which he believed placed him at a disadvantage in succeeding Georges since key competitors in that endeavor were Board members. The unresolved issue of the identity of Georges's successor was brought into sharp relief by the introduction of the Agreement.

When presented with the Agreement, Suwyn informed Georges that he would not sign. Suwyn had concluded that, were he not chosen as Georges's successor, the Agreement, as a practical matter, would bar him from realizing his ambition of becoming CEO of another major company. Suwyn's own reluctance to sign was substantially complicated by the fact that his responsibilities as an executive vice president involved requiring and encouraging his subordinates to execute the same Agreement.

Throughout the spring and into the early summer of 1994, International Paper became increasingly concerned with securing the signatures of key employees in upper-level management on the Agreement. Other key International Paper officials, including James Wilderotter, the General Counsel, also balked at signing the Agreement. At weekly "pre-operating" committee meetings of key executives, lists of those whose had not signed were circulated and discussed. Featured on this list was, of course, Mark Suwyn.

The standoff between Suwyn and International Paper over his failure to execute the Agreement came to a head on July 16, 1994 when Georges called Suwyn into his office to discuss Suwyn's unwillingness to sign. Georges, because of his past conversations with Suwyn, knew the reason behind Suwyn's intransigence. Georges, however, was confronted with the internal political problem of having one of his most senior executives refusing to sign an Agreement that other senior executives had reluctantly signed, largely at the Chairman's urging.

Although there is conflicting testimony as to the scope of the discussion at the meeting, it is clear that Georges undertook to reassure Suwyn that International Paper did not intend to apply the Agreement as written to Suwyn, should the occasion for enforcement arise. Georges stated that, notwithstanding

the broad language of the Agreement, Suwyn should understand that, in Georges' words, it was "basically intended to keep him from going to work for a direct competitor." (Tr. 695). Georges told Suwyn that, for example, International Paper's chemical division makes a variety of chemicals but because International Paper played a "insignificant part in the chemical industry," it was "not our intent—and that's what I tried to express to Mark—to keep him from going to work for many chemical companies that did not compete with us. And there are dozens of chemical companies that we-do not compete with." (Tr. 695). Georges' recollection of the meeting was that he reassured Suwyn that the Agreement would not be construed by International Paper to bar Suwyn from going to a number of companies that, although direct competitors, competed only in those areas where International Paper was a "niche" player. In addition, Georges told Suwyn he did not want him working for those companies in the "imaging business" that compete directly with International Paper.

These apparent qualifications to the Agreement were significant because they reassured Suwyn that his job possibilities, should he leave, were not as limited as he feared because, as he understood Georges, International Paper did not intend to enforce the Agreement against him as it was written but, instead, consistent with the spirit of their July 16 conversation. According to Georges, "the whole tone of the conversation is the kind of assurance that this was a targeted Noncompete clause, not some broad item that tried to cover a scope beyond the companies that we actually competed with." (Tr. 700). Georges, however, throughout his trial testimony, was adamant that he intended absolutely no modifications of the Agreement to result from the July 16 meeting.

Suwyn's recollection of the meeting differs from that of Georges. Suwyn testified that during their conversation he reiterated to Georges his long-standing objections to the Agreement. According to Suwyn, Georges told him that Suwyn misunderstood the implications and the scope of the Agreement and that it was "not really a big deal." Georges also told him "[the Agreement] is aimed at keeping you from going directly from here to working for the big paper companies, Weyerhaeuser, Georgia–Pacific and Champion and I really don't want you to leave here and go work for the imaging folks at Kodak or your old group at DuPont, or Fuji and Agfa for the fact that we've got a real difficult issue here with our imaging business and I don't think that's appropriate." (Tr. 325).

Suwyn viewed these representations as a significant concession from Georges and as an attempt by the CEO to break the impasse that had existed between them for several months. By bridging the gap between their positions so that the document could be signed, Georges could avoid an unpleasant and potentially disruptive intramural political problem concerning the Noncompete. With the understanding that he would only be restricted from specific companies in the imaging business and major producers of paper such as Georgia Pacific, Champion or Weyerhaeuser, Suwyn was willing to sign the Agreement.

The next day, July 17, 1994, Suwyn prepared and submitted a letter to Georges ("the side letter"), stapling it to the copy of the Agreement he had signed. Directly above his signature on the Agreement, he wrote the words "signed with reference to a cover memo to J.A. Georges dated July 17, 1994." The July 17 side letter stated:

> I am returning a signed Noncompete Agreement (attached) with this note to record the discussions we have had on this subject so there is no confusion in the future. As you have described it and would intend to enforce it, the Agreement is aimed at restricting me from working for another major paper company such as Georgia Pacific, Champion or Weyerhauser [sic] for 18 months if I were to leave International Paper. In addition, it is aimed at restricting me from joining the Imaging businesses of Kodak, Fuji, Du Pont and Agfa as they are direct competitors with the Imaging business of International Paper. In the other business areas under my responsibility we are more of a niche player and therefore the agreement would not be viewed as being in force when it comes to joining such companies as

Xerox, Dow, Exxon and other participants in broad industries in which we compete. The agreement not to hire anyone from International Paper for 18 months if I were to leave International Paper would be in effect regardless of what company I might join.

It is with the understanding above that I have signed the agreement.

Suwyn then sent the Agreement and attached side letter to Georges for review and counter signature. Georges read the documents, concluded that they fairly captured the spirit of his understanding with Suwyn and, twelve days later, on July 29, 1994, forwarded them to Robert Byrnes, International Paper's Senior Vice President for Human Resources. Georges testified that he believed that the side letter had no legal significance and merely "captured the spirit" of the prior discussion about how he intended to enforce the Noncompete.

Upon receiving the Agreement and attached side letter, Byrnes spoke with Georges to determine whether Byrnes could sign the Agreement to which the July 17 letter was affixed and which included references to the letter on its final page. On August 17, 1994, after ensuring that the side letter accurately reflected the Georges–Suwyn July 16 conversation, Byrnes executed the Agreement on behalf of International Paper. Shortly thereafter, Suwyn received a memorandum which stated, "Attached is a copy of your fully executed confidentiality and noncompete agreements." Both the Agreement and the side letter were affixed to the memorandum.

Several months later, Suwyn's Noncompete again surfaced as a subject of contention. In January 1995, Georges indicated to Suwyn that the Legal Department at International Paper had developed some concerns about the side Letter and wanted Suwyn to sign a different one. When Suwyn questioned Georges about the reason for this request, Georges told him that "it would look better and the legal folks would like to have that." (Tr. 573) A replacement letter, which, in Suwyn's mind, would have rendered the agreement as broad as the Noncompete in its original form, was sent to Suwyn who re-

viewed it and refused to sign it. Georges testified that he does not recall ever asking Suwyn to sign any such replacement letter.

Then, in mid-September 1995, Georges announced that John Dillon, another International Paper Executive Vice President and a member of the Board, would be named President and Chief Operating Officer upon Georges' impending departure. Meanwhile, in July 1995, Louisiana–Pacific had been wracked by a series of resignations of its most senior executives, including its CEO. Louisiana–Pacific retained SpencerStuart, an executive search firm to locate a new CEO. The day that Dillon's promotion was made public, SpencerStuart approached Suwyn to inquire as to whether he would be interested in becoming a candidate for the Louisiana–Pacific CEO position.

Following his initial contact with SpencerStuart, Suwyn interviewed with the directors of Louisiana–Pacific and, following negotiations in October and November 1995, Suwyn, by mid-December 1995, emerged as the leading candidate for the job of CEO at Louisiana–Pacific. Unaware of these developments, the International Paper Board elected Suwyn a member and, on December 12, he attended his first Board meeting as a member. On January 2, 1996, the Board of Directors of Louisiana–Pacific approved Suwyn as the new Chairman and CEO.

The pivotal question in this litigation is the precise scope and terms of the agreement between Suwyn and International Paper with respect to the Noncompete. International Paper contends that Suwyn was bound by the Agreement in its original form and that the July 17 side letter has no legal effect. The letter, International Paper argues, was designed simply to record discussions concerning hypothetical applications of a binding contract Suwyn had signed.

International Paper points to a number of things to support its position. First, the July 17 side letter states that it is merely intended "to record the discussions" between Suwyn and Georges on the subject of the Agreement which, by its express terms, could not be modified except with a writing countersigned by International Paper. The side

letter, according to International Paper, contains no indication that it is intended to modify or amend the Agreement, or to be integrated with it. International Paper also points to the fact that in conversations leading up to the execution of the Noncompete and the preparation of the July 17, 1994 letter, there was no discussion between Suwyn and Georges explicitly discussing modifications of the Agreement.

Georges further testified that after he received and read the July 17 letter, he concluded that it "captured the spirit" of his discussion with Suwyn. He was also· adamant that he never agreed to modify the terms of the Noncompete that was presented to Suwyn and that the memorandum did nothing other than record their discussions. Thus, according to International Paper, the July 17 letter has no legal significance since it was offered to reflect Suwyn's "grumbling acceptance" of the Noncompete.

In stark contrast, Suwyn clearly believed that the Noncompete, as modified by the side letter, and not the underlying Agreement alone, constituted the agreement that he had reached with International· Paper. It was not ·seriously disputed at trial, and, in any event, I credit Suwyn's testimony that without some significant modification to its terms, he would never have signed the underlying Noncompete. Suwyn's ambition of becoming a CEO of a major commercial enterprise had been a goal he had pursued throughout his career and was well known to Georges. Suwyn believed that the July 17 letter reflected an agreement with Georges that, should he leave International Paper, his employment options would be circumscribed by the letter's relatively narrow terms, and not by the broad terms of the Noncompete standing alone.

It was with these markedly different understandings that Suwyn and International Paper entered into the agreement that forms the basis of International Paper's underlying breach of contract claim. Defendants argue that there is no enforceable contract between Suwyn and International Paper because there was an "absolute failure of the meeting of the minds." Georges and International Paper, defendants continue, at the time of

contracting, believed that they would be bound by the broad noncompete and that the side letter had no legal significance. Suwyn, in turn, believed that his agreement constituted the Noncompete as substantially modified by the side letter. The parties, thus having agreed to two materially different things, were "ships passing in the night who reached no meeting of the minds whatsoever on the terms of Suwyn's noncompete." Defs.' Post–Trial Memo. at 8.

## DISCUSSION

### 1. Meeting of the Minds

█ As a general proposition of contract law, where an agreement has been reduced to a writing, if the material terms of that writing are .facially unambiguous, the agreement constitutes a fully enforceable contract, and the Court may not consider extrinsic evidence to alter or interpret its meaning. *See Consarc Corp. v. Marine Midland Bank,* 996 F.2d 568, 573 (2d Cir.1993); 2 Samuel Williston, A Treatise on the Law of Contracts § 6:58, at 712–13 (4th Ed.1991) [hereinafter Williston] ("Traditionally, courts will give the language its natural and appropriate meaning, and if words are unambiguous, will generally not admit evidence of what the parties may have thought the meaning to be."). As such a writing exists here, the Court must first determine what document or collection of documents constitutes the relevant writing. Second, the Court must determine whether the relevant writing is facially ambiguous. Third, if that writing is, in fact, ambiguous, the Court must assess whether the parties reached a "meeting of the minds" when entering into the agreement, that is whether those terms were, in fact, differently understood by the contracting parties.

██ Here, because the parties disagree as to whether the side letter is irrelevant or whether it modified the underlying Agreement, the Court must first determine whether the Agreement alone or as modified by the side letter constitutes the relevant writing. As a general rule, "in order for an acceptance to be effective, it must comply with the terms of the offer and be clear, unambiguous, and unequivocal." *King v. King,* 208 A.D.2d

1143, 617 N.Y.S.2d 593, 594 (3d Dep't 1994). The mere fact that an offeree requests that certain changes be made in the contract is not, standing alone, fatal to the offeree's purported acceptance. Indeed, " 'a request for a modification of the offer *coupled with an otherwise unqualified acceptance,* which does not depend on the offeror's assent to the requested change, operates as an acceptance and a contract is thereby formed.' " *King,* 617 N.Y.S.2d at 594 (citing 2 Williston, Contracts § 6:16, at 130–131 (Lord 4th Ed.)) (emphasis in original); *see* Restatement [Second] of Contracts § 61 (1981) [hereinafter Restatement].

An acceptance, however, that is conditioned on terms at variance with those in the offer operates as a counteroffer and terminates the original offer. *See Gram v. Mutual Life Ins. Co.,* 300 N.Y. 375, 382, 91 N.E.2d 307 (1950); *Roer v. Cross County Med. Ctr. Corp.,* 83 A.D.2d 861, 441 N.Y.S.2d 844, 845 (2d Dep't 1981); *John's Insulation, Inc. v. Siska Constr. Co.,* 671 F.Supp. 289, 292 (S.D.N.Y.1987); Restatement § 59 ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counteroffer."). If the original offeror assents to the terms of the counteroffer, then a contract is formed on those terms. *See John's Insulation,* 671 F.Supp. at 292. If the original offeror does not respond to the counteroffer, but proceeds with performance of the contract, his conduct may be considered an expression of assent to the terms of the counteroffer. *Id.*

Here, Suwyn's acceptance was far from unequivocal. The language of the side letter states that it was "with the understanding" of the modifications set forth in the letter that Suwyn was signing the Agreement. The Agreement, in turn, was signed "with reference" to the side letter. As the letter qualified essential terms of the Agreement, the "with the understanding" language used by Suwyn makes it far from clear that the contract would have been acceptable to

Suwyn if the changes were not granted. *See King,* 617 N.Y.S.2d at 594.

Indeed, notwithstanding Georges' subjective belief that the July 16 discussion and the July 17 side letter merely provided clarification of the terms of underlying Noncompete, the objective indicia of intent are that the "clarifications" imposed materially different terms and are far more permissive than the unchanged Noncompete, as literally read. During their July 16 discussion, Georges told Suwyn he could not work for another major paper company or in the imaging business, but he could work for competitors in smaller "niche" areas. Under the literal terms of the Agreement, however, Suwyn would clearly be precluded from working for those companies.

I accordingly find that the side letter constituted a counteroffer and Byrnes's countersignature on the Noncompete constituted an acceptance of Suwyn's counteroffer. It is therefore to the Noncompete as modified by the side letter (collectively "the integrated Agreement") that this Court looks to determine whether a contract was formed.

It is well settled under New York law [3] that a contract is unenforceable where there is no meeting of the minds between the parties regarding material elements of the agreement. *Brands v. Urban,* 182 A.D.2d 287, 587 N.Y.S.2d 698, 700 (2d Dep't 1992); *May v. Wilcox,* 182 A.D.2d 939, 582 N.Y.S.2d 294, 294 (3d Dep't 1992). Where an agreement has been reduced to a writing, the Court, in assessing whether a contract fails for lack of meeting of the minds, must look to the terms of the written agreement to determine whether mutual assent has occurred. *See* Restatement § 20 comment c. "Where the offeror, using ambiguous language, reasonably means one thing and the offeree reasonably understands differently, there is no contract." *Brands,* 587 N.Y.S.2d at 700; *Gupta v. University of Rochester,* 57 A.D.2d 731, 395 N.Y.S.2d 566 (4th Dep't 1977). As one commentator has noted,

[i]f an expression, in light of the circumstances under which it was used, may fair-

---

**3.** The parties in this diversity action are in agreement that New York law governs International

Paper's claims.

ly mean either of two things, each party, unless he is in some way responsible for the error, may attach his own interpretation. Therefore, when a phrase in a contract has no obvious meaning, or is reasonably capable of different interpretations, and is in fact differently understood, there is no contract.

2 Williston, Contracts § 6:58, at 695–701; *see Metrano v. Eisen,* No. 87–4186, 1993 WL 17331 (S.D.N.Y. Jan. 21, 1993); Corbin § 4:10. Thus, in assessing whether a contract is unenforceable due to lack of meeting of the minds, the Court must first consider whether the terms of the agreement are ambiguous.

■■■ An ambiguous term is one that is susceptible to more than one reasonable interpretation. *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 429 (2d Cir. 1992). Defined more specifically, a term is ambiguous when it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Seiden,* 959 F.2d at 428; *Curry Road, Ltd. v. K Mart Corp.,* 893 F.2d 509, 511 (2d Cir.1990); *Pantone, Inc. v. Esselte Letraset, Ltd.,* 878 F.2d 601, 606 (2d Cir. 1989). Conversely, "[c]ontract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Curry Road,* 893 F.2d at 511 (citations omitted).

■■■ The critical phrase in the integrated Agreement is in the side letter's second sentence, as no other language in the letter can be read to address whether Suwyn is precluded from working for Louisiana–Pacific. That sentence states, "As you have described it and would intend to enforce it, the Agreement is aimed at restricting me from working for another major paper company such as Georgia Pacific, Champion or Weyerhaeuser." Defendants contend that this qualification unambiguously applies only to major companies that produce paper or have a

large paper business, and Louisiana–Pacific that does not manufacture paper. International Paper's proxy statements list the three specified companies—Georgia–Pacific, Champion, and Weyerhaeuser as key competitor companies in International Paper's "Peer Paper Group," while Louisiana–Pacific was not included on that list. Thus, reading each of the words in that phrase literally, defendants argue, the phrase "major paper company" cannot be construed to include Louisiana–Pacific.

At first glance, defendants' reading appears, if each word is held to is ordinary usage, to be the obvious meaning of the phrase. Plaintiff, however, contends that "major paper company" is commonly used, as Suwyn should well know, in the trade as short hand for a company in an industry known as the "paper and forest products industry." Georges testified that in common industry usage, "paper company" is often used to describe companies that own or manage timberlands, manufacture lumber, pulp, other wood products, or paper itself. International Paper also introduced analyst reports and trade publications that place Louisiana–Paper within the category of "paper company." Indeed, Suwyn himself admitted that companies like Louisiana–Pacific that derive their primary source of revenues from wood products and forest land operations are, at times, referred to, though inaccurately so, as "paper companies." Moreover, forest products comprised the largest revenue producing division under Suwyn's management. It would be highly anomalous for Georges to allow Suwyn to work for a direct competitor in that area of production, but prohibit him from working for imaging companies, as the letter explicitly does, which constituted a much less significant area of responsibility.

Not only were the different meanings that Suwyn and Georges attached to the phrase "major paper company" both reasonable, it is clear from both Georges' and Suwyn's testimony that those terms were differently understood by them. Suwyn fairly believed that Georges, by conceding that Suwyn would only be precluded from working for International Paper's largest paper competi-

**256**

tors, was making "an offer … that bridged the gap" between them. Meanwhile, it is equally reasonable that Georges, when reading the language "major paper company" understood it to encompass companies in the paper and forest products industry, such as Louisiana–Pacific, which directly compete with International Paper's forest and specialty products division, Suwyn's primary area of responsibility. Accordingly, in view of these different and reasonable understandings of the key language in the Agreement, the Court finds that there was no enforceable agreement between Suwyn and International Paper.

**2. Irreparable Harm**

█ Even if either party had been able to demonstrate that the integrated Agreement was unambiguous or that the other party actually understood the contract in the same way, plaintiff has failed to meet its burden of demonstrating irreparable harm. Federal courts have long recognized that a showing of irreparable harm is a prerequisite to permanent injunctive relief. *See Rondeau,* 422 U.S. at 57, 95 S.Ct. at 2075 (permanent injunction denied for failure to show irreparable harm); *National Org. for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir. 1989) ("Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted."); *Reuben H. Donnelley Corp. v. Mark I Marketing Corp.,* 925 F.Supp. 203, 207 (S.D.N.Y.1996). In addition, the applicant for the injunction must "establish more than a mere 'possibility' of irreparable harm, rather, it must show that irreparable harm is 'likely' to occur." *Lumex, Inc. v. Highsmith,* 919 F.Supp. 624, 628 (E.D.N.Y.1996) (citing *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990)); *Socialist Workers Party v. Attorney Gen. of the United States,* 642 F.Supp. 1357, 1425 (S.D.N.Y.1986) ("[A] permanent injunction is a proper remedy only where it will eliminate existing or presently threatened injuries.").

█ In assessing whether irreparable harm is likely in the context of noncompetition covenants, New York courts have recognized that such agreements, which tend to prevent an employee from pursuing a similar vocation after the termination of employment, are disfavored in the law. *See Reed, Roberts Assocs., Inc. v. Strauman,* 40 N.Y.2d 303, 386 N.Y.S.2d 677, 680, 353 N.E.2d 590, 593–94 (1976); *Skaggs–Walsh, Inc. v. Chmiel,* 224 A.D.2d 680, 638 N.Y.S.2d 698 (2d Dep't 1996). Thus, restrictive covenants, such as the integrated Agreement, will only be enforced to the extent necessary to protect the employer from unfair competition stemming from "the employee's use or disclosure of trade secrets or confidential customer lists, … or where the employer is exposed to special harm because of the unique nature of the employee's services." *American Inst. of Chem. Eng. v. Reber–Friel Co.,* 682 F.2d 382, 387 (2d Cir.1982); *see, e.g., Scott Paper Co. v. Finnegan,* 101 A.D.2d 787, 476 N.Y.S.2d 316, 318 (1st Dep't 1984); *Continental Group, Inc. v. Kinsley,* 422 F.Supp. 838, 843 (D.Conn.1976) (applying New York law)

Thus, the New York Court of Appeals has held that injunctive relief may be warranted upon a "showing that any secret information was disclosed," *Columbia Ribbon & Carbon Mfg. Co. v. A–1–A Corp.,* 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 1007, 369 N.E.2d 4, 6–7 (1977) (injunctive relief denied where there was no showing that any secret information was disclosed and where plaintiff's sworn representations that no secrets had been involved in his employment, that he had taken possession of no customers lists or files were not controverted). On the other hand, mere "knowledge of the intricacies of a [former employer's] business operation" does not constitute a protectable secret that would justify prohibiting the employee from "utilizing his knowledge and talents in this area." *Reed, Roberts Assocs.,* 386 N.Y.S.2d at 680, 353 N.E.2d at 594. "A contrary holding, the New York Court of Appeals has emphasized, would make those in charge of operations or specialists in certain aspects of an enterprise virtual hostages of their employers." *Id.*

█ International Paper contends that Suwyn had access to information relating to potential acquisitions, manufacturing cost data, research and development projects and

plans, marketing strategies, and long term strategic plans for International Paper's Masonite division and wood products area. I find, based on the record and the extensive testimony of both Georges and Suwyn, as well as the deposition testimony of other Louisiana–Pacific and International Paper executives, that much of the allegedly confidential information suggested by International Paper as deserving protection from disclosure does not currently merit protection. *See Scott Paper*, 476 N.Y.S.2d at 317.

In the latter part of 1995, Suwyn had the opportunity to review business plans relating to International Paper's wood products and Masonite divisions as well as information generated by International Paper concerning the relative merit of International Paper's OSB siding in comparison with International Paper's hardboard siding products. Suwyn testified, and International Paper submitted no contrary evidence, that all of the "technology" discussed in the wood products business plan is "commercially available and being purchased from the outside." (Tr. 453). He also testified that the profit margins set forth in that plan, which is now over a year and a half old, are available with reasonable precision from outside sources. Suwyn took neither of these documents, nor did he take any other confidential documents, with him when he left International Paper. In the approximate 15 month period since his departure from International Paper, there is no indication that Suwyn has exploited any information that he may have gleaned from those plans, or intends to do so.

Likewise, much of the testimony relating to the confidentiality of the technology surrounding product areas under Suwyn's supervision was unconvincing. Although much was made of Suwyn's access to technology relating to the production of OSB, Louisiana–Pacific's principal product, and International Paper's silviculture techniques, plaintiff failed to establish that such technology was unavailable in the industry. Not only are the plans for building OSB plants commonly available, but the equipment for producing OSB can be purchased on the open market. Moreover, International Paper's Masonite Division, which produced OSB, has apparently abandoned the product. It is, therefore, difficult to conceive of the tangible harm that International Paper could suffer as a result of Suwyn's use or disclosure of OSB-related information obtained while he was an employee of the company. Likewise, it appears that silviculture techniques involve commonly used nonsecret methods, and were actually techniques that Champion shared with Louisiana–Pacific's senior foresters on a tour of Champion's forest lands.

International Paper further offers as evidence of irreparable harm a number of instances where it alleges Suwyn has, in fact, already used or disclosed International Paper's confidential information. As an example, International Paper cites to Louisiana–Pacific's identification of a company called Jeld–Wen, a competitor of International Paper in its highly profitable doorskin business—an area of production that Louisiana–Pacific has yet to enter—as a potential acquisition candidate.

The identification of Jeld–Wen is said to demonstrate that Suwyn, who had confidential information concerning International Paper's doorskin business (*see* Tr. at 200–01), is prepared to use that information to benefit his new employer. According to Suwyn's uncontroverted testimony, however, Louisiana–Pacific's investment banker, without any direction from Suwyn, presented Suwyn with a list of potential acquisitions, which included Jeld–Wen. Suwyn further testified that Louisiana–Pacific has no intention of acquiring Jeld–Wen or entering into the doorskin business.

International Paper further argues that Suwyn had access to propriety gene marker genetics research information which he has used to benefit his new employer. Suwyn testified that he determined not to allocate any of Louisiana–Pacific's research and development funds to this research as it is "really speculative." International Paper contends that it is precisely by not taking Louisiana–Pacific into this research area that Suwyn relied on knowledge gained at International Paper.

These examples of misappropriation and disclosure of "confidential information" simply do not present the significant level of

irreparable harm necessary for the imposition of the drastic relief of a permanent injunction. Notwithstanding the fact that Suwyn took none of the allegedly confidential and proprietary information when he left International Paper, *see Reidman Agency, Inc. v. Musnicki*, 79 A.D.2d 1094, 435 N.Y.S.2d 837 (4th Dep't) (injunctive relief to enforce noncompete unavailable where defendant had returned confidential documents taken from former employer); *Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F.Supp. 547 (E.D.N.Y.1995) (defendants' stipulation that they would not use certain confidential information rendered issue of enforcement of restrictive covenant "moot"); *Bijan Designer for Men. Inc., v. Katzman*, 1997 WL 65717 (S.D.N.Y. Feb.7, 1997) (injunction denied for, among other reasons, lack of irreparable harm despite taking of confidential documents and violation of nonsolicitation agreement where defendant later returned the documents), much of that information was available through other sources in the industry. *See Reed, Roberts Assocs.*, 386 N.Y.S.2d at 680, 353 N.E.2d at 594 (where confidential information was readily discoverable through public sources, an injunction would not issue). Moreover, the passage of more than fifteen months since Suwyn's departure makes this type of information sufficiently old and stale that an injunction is unnecessary to protect it. *See Scott Paper*, 476 N.Y.S.2d at 317.

Arguing that it need not prove the "likelihood" of irreparable harm, International Paper points to a small body of cases for the proposition that a former employee's mere access to confidential information combined with the potential for disclosure to the new employer is sufficient to establish the irreparable harm necessary for injunctive relief. *See, e.g. Lumex*, 919 F.Supp. 624; *Continental Group, Inc. v. Kinsley*, 422 F.Supp. 838 (D.Conn.1976). International Paper argues that its burden of demonstrating irreparable harm is satisfied as it is uncontested that Suwyn had access to International Paper's confidential information in a number of areas directly related to the business he now manages at Louisiana–Pacific. As he "cannot eradicate … this confidential information from his mind," *Lumex*, 919 F.Supp. at 631, Suwyn would, unless enjoined, inevitably and inadvertently use that information in his efforts to benefit Louisiana–Pacific.

I, however, do not find the narrow line of cases advanced by International Paper to be inconsistent with the long standing proposition that irreparable harm be shown before injunctive relief may issue. In *Lumex*, the court noted that the presumption of inevitable disclosure was supported by evidence of a "high risk" of disclosure—testimony that "it would be impossible for [the defendant] not to divulge confidential information." *Lumex*, 919 F.Supp. at 631. In addition, "evidence that there will inevitably be immediate disclosure of trade secrets … was adduced in cross-examination of [plaintiff]," *id.* at 631, during which he conceded that he could improve his new employer's equipment by using confidential information gained in his former employment. Here, apart from the Court's conclusion that much of the information that was available to Suwyn at International Paper is now stale, there was no such evidence that Suwyn would disclose that confidential information in his capacity as Louisiana–Pacific's CEO. Moreover, the *Lumex* court found that, because the particular industry involved—the health fitness industry—was a " 'copy cat' or cloning industry," *Lumex*, 919 F.Supp. at 629, the confidential information at issue "would be greatly detrimental to the business interests of [the new employer]." *Id.* at 630.

The other cases cited by International Paper involved the potential disclosure of trade secrets by employees who had expertise in highly technical industries. *See Kinsley*, 422 F.Supp. at 841 (engineer in the field of "plastic container process development"); *Business Intelligence Servs., Inc. v. Hudson*, 580 F.Supp. 1068 (S.D.N.Y.1984) (computer software). These courts, in granting injunctive relief on the basis of "potential" or "inevitable" disclosure, considered the then present state and nature of the industries at issue to determine whether the alleged harm would, indeed, be irreparable. Thus, injunctive relief was granted where the employee's knowledge would allow a competitor to improve its business with little or no effort, *see Business Intelligence*, 580 F.Supp. at 1072, or where the present and former employers

were "endeavoring to develop the identical product" and the breaching employee had "learned exactly how [his former employer] was making the [product]," including all details concerning the production process, which refinements in the process were producing improvements and failures, and how near to success development efforts were. *Kinsley,* 422 F.Supp. at 845.

Here, the businesses at issue—wood and building products—are comparatively low-technology industries, and Suwyn's work at International Paper was driven by general managerial expertise as opposed to the application of highly technical, proprietary, or secret information. Even presuming that any proprietary technology existed, I find no evidence supporting a conclusion that Suwyn had or misappropriated any specific knowledge regarding such technology. Moreover, Georges acknowledged that he had no evidence that Suwyn had breached his confidentiality agreement with International Paper. Accordingly, I find that the level of risk that justified the grant of injunctive relief in the cases cited by plaintiff is simply not present in this case.

International Paper next contends that, even assuming that Suwyn had no knowledge of protectable information, the requisite irreparable harm has been shown because Suwyn's services as executive vice president of Forest Products were "unique." Court have held that, where an employee's services are truly " 'special, unique or extraordinary' and not merely of 'high value to his employer,' injunctive relief may be available though trade secrets are not involved." *Columbia Ribbon,* 398 N.Y.S.2d at 1006–07, 369 N.E.2d at 6; *see Reber–Friel,* 682 F.2d at 385. In order to justify a enforcement of a restrictive covenant, however

> [m]ore must ... be shown to establish such a quality than that the employee excels at his work or that his performance is of high value to his employer. It must also appear that his services are of such character as to make his replacement impossible or that the loss of such services would cause the employer irreparable injury.

*Reber-Friel,* 682 F.2d at 390 n. 9. Clearly, Suwyn's services cannot be so described. In-

ternational Paper has adduced no evidence that it suffered any harm from the loss of Suwyn's services. Indeed, within a month of Suwyn's resignation, International Paper had reassigned all of his responsibilities to its current employees. As noted by the New York Court of Appeals in *American Broadcasting Cos. v. Wolf,* 52 N.Y.2d 394, 438 N.Y.S.2d 482, 486 n. 6, 420 N.E.2d 363, 367 n. 6 (1981), "no New York case has been found where enforcement [of a restrictive covenant] has been granted, following termination of the employment contract, solely on the basis of the uniqueness of the services." See *Reber–Friel,* 682 F.2d at 390 n. 9. This Court's research reveals none either.

In sum, International Paper has not demonstrated that absent an injunction barring Suwyn from working at Louisiana–Pacific it will suffer irreparable harm. *See Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990). This conclusion strikes with particular force where, as here, there is no evidence, despite the passage of time and despite the occurrence of extensive pre-trial discovery, of misappropriation by Suwyn of documents or data or any disclosures by Suwyn that can be said to constitute irreparable harm to International Paper or that support a claim for breach of fiduciary duties. *See Mayo, Lynch & Assocs. v. Fine,* 148 A.D.2d 425, 538 N.Y.S.2d 579, 580 (2d Dep't 1989).

## CONCLUSION

For the reasons stated above, International Paper's application for injunctive relief is denied, and its claims against Suwyn for breach of fiduciary duty and against Louisiana–Pacific for tortious interference with contract are dismissed.

**SO ORDERED.**