**PSC INC. and PSC Scanning, Inc., Plaintiffs,**

v.

**Martin J. REISS and Optimal Robotics Corporation, Defendants.**

**No. 00-CV-6323L.**

United States District Court, W.D. New York.

Aug. 23, 2000.

John M. Wilson, Boylan, Brown, Code, Vigdor & Wilson, LLP, Rochester, New York, for plaintiffs.

Francis E. Kenny, Nixon Peabody, LLP, Rochester, New York, for defendant, Optimal Robotics Corp.

Bradley J. Butwin, O'Sullivan, Graev & Karabell, LLP, New York City, for defendant, Martin J. Reiss.

*DECISION AND ORDER*

LARIMER, Chief Judge.

In this action, PSC, Inc. and PSC Scanning, Inc. ("PSC") seek a preliminary injunction barring one of its former salesmen, defendant Martin J. Reiss ("Reiss"), from working for a competitor, Optimal Robotics Corporation ("Optimal"), at least until February 2001. PSC also seeks related relief including an injunction precluding Reiss from disclosing any trade secrets or confidential information to Optimal that he obtained while employed at PSC.

Because PSC has failed to meet the rigorous requirements for obtaining such relief, the motion for a preliminary injunction is denied. The principal remedy sought by PSC is to bar one of its most successful salesmen from working in the same capacity with Optimal, a company that PSC hopes to compete with commencing in January 2001. Such a remedy—barring a person from working in his chosen field or profession—is generally disfavored except in the most unique circumstances. In sum, the facts developed at the

hearing on this matter do not support the relief requested.

■ In general, to be entitled to a preliminary injunction, a litigant must show "(1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 149 (2d Cir.1999). In appropriate circumstances, the owner of trade secrets may obtain an injunction against their use or disclosure by another in breach of his confidential relationship with the owner. *See Bridge C.A.T. Scan Associates v. Technicare Corp.*, 710 F.2d 940, 946 (2d Cir.1983).

■ "[A] trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" *Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.*, 118 F.3d 955, 968 (2d Cir.1997) (quoting Restatement of Torts § 757 cmt. b (1939)), *cert. denied*, 523 U.S. 1020, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998); *accord Ashland Mgt. Inc. v. Janien*, 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993). In determining whether information constitutes a trade secret, New York courts have considered the following factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Ashland Mgt.*, 82 N.Y.2d at 407, 604 N.Y.S.2d 912,

624 N.E.2d 1007; *accord Hudson Hotels Corp.*, 995 F.2d 1173, 1176 n. 1 (2d Cir. 1993); *Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir.1990).

The Court conduct an expedited, four-day hearing on plaintiffs' application for immediate injunctive relief. The Court heard extensive testimony from Reiss, Linda J. Miller, Senior Vice–President for PSC ("Miller"), and Neil Wechsler, Chief Executive Officer of Optimal ("Wechsler"), on the matters in dispute. The Court also received and considered scores of exhibits and related documentary evidence.

Most of the material facts established at the hearing were largely uncontested. PSC and Optimal have worked as partners for the past several years to manufacture and market one product—an automated self-checkout system for use in grocery stores and other retail establishments. The system is marketed under the trade name "U–Scan®" which is owned by Optimal.

The system, as designed, allows customers to "checkout" and pay for their purchases without the aid of a store employee by using the automated scanning, weighing and cash management system integrated into the unit. Optimal owns the trademark, developed the computer software necessary and designed the configuration of the U–Scan® unit.

Since 1998, PSC's role has been to manufacture and assemble the component parts into the U–Scan® unit for shipment to customers. Customers dealt directly with Optimal concerning terms of payment and service.

Although PSC has other products including scanners, by the terms of the agreement between PSC and Optimal, PSC is precluded from competing with Optimal in the self-scanning business, as long as their contract remains in effect.

The self-scanning business was in its infancy in 1995, when PSC and Optimal began their relationship. Now, it is a fast

developing business with several different companies attempting to gain entry into the market. Wechsler, CEO of Optimal, testified that Optimal is a leader in this industry. Optimal now has approximately 650 units in stores throughout the United States, including Kroger's, the country's largest grocery chain. Wechsler expected that by February 2001, they would have units in approximately 900 stores, including five of the top ten grocery chains in the country.

The relationship between Optimal and PSC began to deteriorate during the summer of 1999, as the parties discussed terms relating to an extension of their cooperative agreement. The matter came to a head in a September 1999 meeting between the principals of both companies. It became clear at that meeting that the "marriage" between the two was dead. Several weeks later, in late October 1999, Optimal notified PSC that it was exercising its option to terminate the 1998 contract between the parties effective December 31, 2000.

The termination of the relationship allowed PSC to compete with Optimal in the self-checkout industry and PSC began in earnest to design and develop its own system, under the project name "Prowler," to compete with Optimal commencing in approximately February 2001.

Reiss had been employed by PSC for several years as a salesman. When he left PSC in June, 2000, he was Eastern Sales Manager and had several salespersons working under his direction. In addition to his other duties for PSC, he marketed and sold the U–Scan® product as well. The parties seemed to agree that Reiss was an effective salesperson.

It is PSC's development of the Prowler project and Reiss's involvement in it that is at the heart of this case. In a nutshell, PSC claims that Reiss was one of the members of the Prowler Sales Advisory Committee and as such he obtained confidential information about PSC's proposed self-scanning system. PSC claims that Reiss's "defection" from PSC to Optimal, effective July 1, 2000, will inexorably result in the disclosure of secret and confidential information to PSC's detriment. Although PSC appears to concede that it has no evidence that Reiss has disclosed confidential information, it contends that such disclosure will inevitably occur in the future as Reiss performs his duties for Optimal because of Reiss's knowledge about the Prowler project. Thus, PSC seeks not only to ban Reiss from disclosing confidential information but also to preclude him from working at Optimal, at least until February 2001, when PSC anticipates unveiling its Prowler project on the market.

**Requirement For Confidentiality**

It does appear that Reiss could have received some confidential information relating to the intended design of the Prowler self-scan machine. He may also have participated in discussions concerning sales and marketing strategies. Reiss was one of three sales persons selected for the Sales Advisory Committee on the Prowler project. In that capacity, he did attend several meetings and presentations concerning the proposed system that was being developed.

It is clear that Reiss is barred from disclosing any truly confidential information or trade secrets that he obtained while at PSC. Although Reiss had no employment contract with PSC, he did execute such a contract with Spectra–Physics in 1987, a corporation later purchased by PSC. (Exhibit 2). In that contract, Reiss agreed not to disclose any confidential information. Reiss also acknowledged signing a receipt (Exhibit 64) for PSC's Code of Conduct which also contained a requirement of confidentiality. But, whether or not such a written proscription existed, Reiss is still bound not to disadvantage his former employer by the disclosure of confidential information.

Both the Second Circuit and New York courts have held "that an agent has a duty 'not to use confidential knowledge acquired in his employment in competition

with his principal.' " *ABKCO Music Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir.1983) (quoting *Byrne v. Barrett,* 268 N.Y. 199, 206, 197 N.E. 217 (1935)). Such a duty "exists as well after the employment is terminated as during its continuance." *Id.* (internal quotation marks omitted); *accord L.M. Rabinowitz & Co. v. Dasher,* 82 N.Y.S.2d 431, 435 (Sup.Ct.1948) ("It is implied in every contract of employment that the employee will hold sacred any trade secrets or other confidential information which he acquires in the course of his employment. This is a duty that the employee assumes not only during his employment but after its termination.") (internal citations omitted).

But, there is no need for injunctive relief on this issue. The Court need not "order" Reiss to do that which he is required by law to do by dint of his employment contract with PSC and the legal requirements resulting from that employment. If Reiss violates these obligations, he can be held accountable in provable damages.

### PSC's Request To Ban Reiss's Employment With Optimal

PSC seeks to bar Reiss's employment with Optimal until its Prowler product is disclosed to the public in February 2001. PSC is willing to compensate Reiss during his period in limbo. PSC seeks such extraordinary relief because it fears the inevitable disclosure of trade secrets and other confidential information.

"It is ... possible to establish irreparable harm based on the inevitable disclosure of trade secrets, particularly where the movant competes directly with the prospective employer and the transient employee possesses highly confidential or technical knowledge concerning manufacturing processes, marketing strategies, or the like." *EarthWeb, Inc. v. Schlack,* 71 F.Supp.2d 299, 309 (S.D.N.Y.1999), *re-*

*manded,* 205 F.3d 1322 (table), 2000 WL 232057 (2d Cir.), *aff'd,* 2000 WL 1093320 (2d Cir. June 12, 2000).[1]

There are cases which have enjoined employees from working for competitors in the absence of an express non-compete agreement. Such cases, however, "effectively converted [the employee's] confidentiality agreement into a non-compete agreement by enjoining him from working for a direct competitor of" the plaintiff. *Id.* In one such case, *Doubleclick, Inc. v. Henderson,* No. 116914/97, 1997 WL 731413 (N.Y.Sup.1997), there was evidence of actual misappropriation. "However, in cases that do not involve the actual theft of trade secrets, the court is essentially asked to bind the employee to an implied-in-fact restrictive covenant based on a finding of inevitable disclosure. This runs counter to New York's strong public policy against such agreements and circumvents the strict judicial scrutiny they have traditionally required. Indeed, in post-employment disputes that do not involve trade secrets or tortious conduct on the part of the employee, restrictive covenants may not be implied." *EarthWeb,* 71 F.Supp.2d at 310. "Thus, in its purest form, the inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory. Absent evidence of actual misappropriation by an employee, the doctrine should be applied in only the rarest of cases." *Id.*

■ In *EarthWeb,* the court set forth several factors in deciding whether to grant injunctive relief, including: (1) whether the former and current employers are direct competitors providing the same or very similar products or services; (2) whether the employee's new position is nearly identical to his old one, such that it would be almost impossible for him to fulfill his new job responsibilities without

1. The Second Circuit remanded with directions to the district court to make more specific findings underlying its decision to deny injunctive relief. On appeal following the

remand, the court affirmed, agreeing with the district court's findings that the plaintiff had not demonstrated irreparable injury.

utilizing the trade secrets of his former employer; (3) whether the trade secrets at issue are highly valuable to both employers; and (4) the nature of the industry and trade secrets at issue. *Id.*

Describing the application of the inevitable-discovery doctrine as "fraught with hazards," *id.*, the court went on to identify some of the drawbacks of the doctrine, including the power that it puts in the hands of employers, and the concomitant chilling effect on employees, as well as the lack of guideposts for courts other than the "nebulous standard of 'inevitability.'" *Id.* at 310–11. The court concluded that "such retroactive alterations [of employment agreements] distort the terms of the employment relationship and upset the balance which courts have attempted to achieve in construing non-compete agreements." *Id.* at 311.

■ In view of these established legal principles, there are several reasons why the relief sought here by PSC is not warranted. First of all, Reiss did not have a non-compete clause in his contract with PSC. There is no reason why PSC could not have insisted on such a provision with a valued employee like Reiss. In a document entitled, "Change–In–Control Agreement" (Exhibit 3), PSC and Reiss entered into a severance agreement which would have provided benefits to Reiss should he have been terminated as a result of a change in PSC's ownership. As consideration for the benefit package, Reiss agreed to one-year non-compete clause in the agreement. Although that document is not controlling here, its existence underscores the fact that PSC knew of such non-compete agreements and could have required such an agreement from Reiss as a condition of his continued employment. But, for whatever reason, PSC neglected or declined to require such an agreement.

■ Although this case does not involve an express covenant not to compete, to grant the relief sought here would in effect convert the confidentiality agreement into such a covenant. Restrictive covenants limiting an employee's ability to work in his chosen field are not favored by the courts. *Columbia Ribbon & Carbon Mfg. Co. v. A–1–A Corp.*, 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 369 N.E.2d 4 (1977); *Business Networks of New York, Inc. v. Complete Network Solutions Inc.*, 265 A.D.2d 194, 195, 696 N.Y.S.2d 433 (1st Dep't 1999). There are two main reasons for this. First, "judicial disfavor of these covenants is provoked by 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood.'" *Reed, Roberts Associates, Inc. v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976) (quoting *Purchasing Associates, Inc. v. Weitz*, 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 196 N.E.2d 245 (1963)).

The second is the desire not to inhibit competition in the marketplace. "Indeed, our economy is premised on the competition engendered by the uninhibited flow of services, talent and ideas. Therefore, no restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment. This includes those techniques which are but 'skillful variations of general processes known to the particular trade.'" *Id.* (quoting Restatement of Agency 2d, § 396, Comment b).

There are other reasons why injunctive relief is inappropriate. Reiss was, and is, salesman. His job is to market and sell a product for his employer. He is not a scientist, an engineer, or a computer specialist. He sells the product as is with little knowledge or "how" it works. I am not convinced that Reiss was privy to the highly confidential information relating to software development and engineering that makes such a product truly unique. Although Reiss did participate in some general discussions while at PSC about how the new Prowler unit might be designed and although he gave some input relative to what he believed customers favored in

such a product, that information is not especially unique, or secret. In fact, it appears that such general information is consistent with what is known throughout the industry. The information discussed by Reiss and the information he obtained from others on the Prowler project was very general and related to work that was, and still appears to be, in the very early stages of development. Much of what Reiss discussed involved general items relating to the proposed design of the machine and none of that seemed very concrete or significant. Much of the information that PSC suggests was highly confidential appears to be modest design alterations to the existing U–Scan® product.

Many of the cases which have applied the inevitable-disclosure doctrine "involved the potential disclosure of trade secrets by employees who had expertise in highly technical industries." *International Paper Co. v. Suwyn*, 966 F.Supp. 246, 258 (S.D.N.Y.1997) (citing cases). In *Suwyn*, the court denied a claim for injunctive relief, noting that "the businesses at issue—wood and building products—are comparatively low-technology industries," and that the defendant employee's "work at International Paper was driven by general managerial expertise as opposed to the application of highly technical, proprietary, or secret information." *Id.* at 259. The court also stated that "much of [the allegedly proprietary information that the defendant was alleged to have taken with him] was available through other sources in the industry." *Id.* at 258.

I accept and credit Wechsler's testimony that the surface design and configuration of a self-scanning unit is of only marginal importance. What is crucial is the internal "guts" of the machine, especially the computer software system. What makes the system beneficial to customers is whether it "works," not how it looks. I also credit Wechsler's testimony that Optimal has little interest in the design configuration of PSC's potential competitive product. What makes Optimal's product successful and has given it the lion's share of the market is its effectiveness, something that PSC has yet to demonstrate in its supposedly competing product.

Furthermore, Reiss's connection with the design and construction of the Prowler unit is extremely remote. The proof demonstrated that Reiss, who lives in Florida, had made only one or two visits to PSC's headquarters in Webster, New York during the time this project was being developed. There was also only a handful of telephone calls or written communications on the subject, and they were all of a very general nature.

It is also difficult to see how the meager information that Reiss had obtained constituted trade secrets. Some of the items that Miller stated were confidential were merely goals that PSC hoped to achieve over time in developing its new product. Miller insisted that these goals and new additions or "hooks" would be beneficial to a competitor, especially since PSC by its present contract with Optimal could not directly compete in the self-scanning business until after December 31, 2000, I am not convinced that such is the case, especially concerning Optimal, an established player in the industry.

I am not convinced that PSC has demonstrated irreparable harm which justifies the drastic remedy sought here. I believe that the meager information that Reiss had obtained about the proposed Prowler system would be of limited benefit to a competitor. Furthermore, it seems to be the case that the information would have provided virtually no benefit to Optimal, the leader in the market, since it already had hundreds of units in place and was in no particular need to develop a new product.

There is also evidence that prior to Reiss's departure, officials at PSC shared with Optimal's officials their general goals relative to creating a competitive product. Certainly Reiss's knowledge of those same

goals is no reason to enjoin him from working for Optimal as a salesman.

It is also a stretch to conclude that Reiss would have to "inevitably disclose" his so-called confidential information during the course of his new employment with Optimal. I am not persuaded that such will be the case. Reiss's efforts for Optimal will be to continue doing what he has been doing for years—sell the Optimal U–Scan® equipment. It is his existing knowledge of that product which will be of importance in his new sales efforts. It is hard to see how his modest knowledge of what PSC hopes to put together in a competing product will be of any assistance to Reiss in marketing Optimal's existing product. Of course, in a few short months, when PSC launches its product, all of the supposed confidential matters will be on display for all to see.

### CONCLUSION

Plaintiffs' motion for a preliminary injunction enjoining defendant Martin J. Reiss from employment with Optimal Robotics Corporation (Dkt. #4) is in all respects denied.

IT IS SO ORDERED.