**INFLIGHT NEWSPAPERS, INC.,
and Inflight Advertising, Inc.,
Plaintiffs,**

v.

**MAGAZINES IN–FLIGHT, LLC, Magazines In–Flight, Inc., Marc Passarelli, Stephen Sergi, James Newton, Jody Dykstra, Elise Antonelli, Scott T. Guido, Edgar Escobar, Elvis Bran and Jan Kuliwoski, Defendants.**

**No. 97–CV–5933 (JS).**

United States District Court,
E.D. New York.

Dec. 17, 1997.

Barry I. Slotnick, J. Lawrence Crocker, Philippa M. Haggar, Michele Levy, Sarah Crossen, Slotnick, Shapiro & Crocker, LLP, New York City, for plaintiffs.

M. Allan Hyman, Certilman Balin Adler & Hyman, East Meadow, NY, for Stephen Sergi, defendant.

Lee M. Albin, Keith H. Richman, Kenneth H. Godt, Albin & Richman, Garden City, NY, for all other defendants.

## MEMORANDUM AND ORDER

SEYBERT, District Judge.

Pending before the Court are the objections submitted by all parties in the instant action to the Report and Recommendation of United States Magistrate Judge Michael L. Orenstein dated November 10, 1997 (hereinafter "R & R").

## BACKGROUND

On October 15, 1997, plaintiffs Inflight Newspapers, Inc. and Inflight Advertising, Inc. (collectively "Inflight") petitioned this Court for a temporary restraining order alleging violations of (1) the Sherman Act, 15 U.S.C. § 2; (2) the Clayton Act, 15 U.S.C. §§ 15, 26; (3) the Lanham Act, § 15 U.S.C. § 1501 et seq.; and (4) supplemental New York State law claims. The suit arises from the establishment by the individual defendants, former officers and employees of Inflight, of two new corporations, Magazines InFlight, LLC, and Magazines In–Flight, Inc. (collectively "MIF"). Specifically, defendant MIF is alleged to have infringed upon Inflight's name and logo, and the individual defendants have purportedly violated non-competition and non-disclosure covenants through the use of trade secrets and other proprietary information of Inflight, and in so doing, have been unjustly enriched. Furthermore, the individual defendants, as former officers and employees of Inflight, are alleged to have breached their fiduciary duties of care, loyalty, and good faith, and to have diverted a corporate opportunity and to have tortiously interfered with Inflight's customer contracts. The Court denied the temporary restraining order application and referred the matter to Magistrate Judge Orenstein to conduct a hearing and to issue a Report and Recommendation on the plaintiffs' motion for a preliminary injunction. An exhaustive three

week hearing was held and the testimony of 24 witnesses and the introduction of 108 exhibits were received into evidence. The facts underlying this action were adduced after a hearing before the Magistrate and are set forth fully in Magistrate Orenstein's report, read into the record on November 10, 1997, which thoroughly outlined the claims raised and the supporting evidence introduced.

Magistrate Orenstein recommended enjoining and restraining the named defendants "and their agents, employees, attorneys or successors or anyone in active concert or participation with them who shall receive actual notice ... from: (a) carrying on or engaging in any business which obtains magazines and newspapers, which binds such magazines into covers and distributes such magazines and newspapers to airlines and others, and (b) using any of plaintiffs' trade secrets, proprietary information or other confidential data ... and (c) using a logo in the shape of a globe or sphere with an airplane circling or crossing such globe or sphere, and (d) stating in any publication in any manner so as to imply that defendants or defendant business entities are the successors to or affiliated with Inflight Newspaper, Inc. or Inflight Advertising Inc." R & R 1, 2.[1]

Upon plaintiffs' application, and pending resolution of the objections to Magistrate Orenstein's Report and Recommendation, the Court has preliminarily adopted the Report and Recommendation. Now, upon reviewing *de novo* the Magistrate's findings and recommendations to which objection is made, as required pursuant to 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), the Court adopts the Report and Recommendation in its entirety.

Objections were separately submitted by the plaintiffs, defendant Stephen Sergi, and all other defendants (the "MIF defendants"). At the outset, the Court admonishes the MIF defendants for what is, essentially, a 50 page brief in opposition to the Magistrate's Report and Recommendation. My individual rules

clearly state that memoranda of law are limited to 20 double-spaced pages and that memoranda that exceed the page limitations will not be considered by the Court. Nevertheless, the MIF defendants submitted a 21 page brief, outlining their objections and providing legal analysis to support their arguments, as well as a 31 page "Memorandum of Law" that merely expands further the same grounds delineated in the defendants' 21 page objection brief and attempts to add new arguments not mentioned in the MIF defendants' objections brief. Accordingly, the Court will *disregard* the MIF defendants' "Memorandum of Law" and will address only arguments raised in the objection brief. This approach is fair to both the plaintiffs and defendant Sergi who were able to comply with my rules and page limitations.

## DISCUSSION

### I. THE STANDARD FOR THE ISSUANCE OF A PRELIMINARY INJUNCTION

In order to obtain a preliminary injunction, the movant must establish that (a) it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of the hardships tipping decidedly in favor of the moving party. *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir.1995).

### A. *Irreparable Harm*

█ Because a preliminary injunction is a drastic measure, *Borey v. National Union Fire Ins. Co.,* 934 F.2d 30, 33 (2d Cir.1991), "the showing of irreparable harm is the 'single most important prerequisite for the issuance of a preliminary injunction.'" *Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc.,* 875 F.Supp. 966, 974 (E.D.N.Y. 1994) (citing *Bell & Howell v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983)); *see also*

---

1. Citations utilized are followed by the page number. R & R—Report & Recommendation; Tr.—Transcript of Preliminary Injunction Hearing; Pls.—Plaintiffs' objections; Def.—MIF defendants' objections; Sergi—Defendant Sergi's objections; Defs. Ex.—Defendants exhibit; Pls. Ex.—Plaintiffs exhibit.

*Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990).

### 1. The Defense of Laches

Preliminary injunctions normally are granted "under the theory that there is an urgent need for speedy action to preserve a party's rights." *Museum Boutique Intercontinental, Ltd. v. Picasso,* 880 F.Supp. 153, 164 (S.D.N.Y.1995). In the context of granting a preliminary injunction, therefore, the district court should generally consider delay in assessing irreparable harm. *Tom Doherty,* 60 F.3d at 39 (citation omitted); *Citibank, N.A. v. Citytrust,* 756 F.2d 273 (2d Cir.1985). Magistrate Orenstein concluded that there was no laches on plaintiffs' part because, despite a three month delay in seeking injunctive relief, the plaintiffs conducted an investigation in order to collect sufficient information to satisfy the demonstration of irreparable harm. Tr. 1, 14–18, 2352.

The MIF defendants seem to argue that because the Court denied the plaintiffs a TRO on finding there was no *immediate* threat of irreparable harm, that somehow plaintiffs are now precluded from establishing irreparable harm to secure a preliminary injunction. Defendant Sergi argues that the plaintiffs should have promptly moved for injunctive relief as soon as Mrs. Lehner became aware of MIF's existence in August 1997. Because the plaintiffs chose to wait until they lost the contract from American Airlines, the defendants argue that they assumed the risk of defendants' continued operations and should be estopped from obtaining equitable relief when they are guilty of gross laches.

The Court finds that the record reflects sufficient evidence to rebut a finding of laches that would bar a finding of irreparable harm. As Magistrate Orenstein correctly found, beginning on July 16, 1997, the plaintiffs, through counsel, sent the key defendants a letter with regard to their activities. Defs. Ex. W. Defendants Sergi, Newton and Passarelli then responded through their own attorney on July 22, 1997, which expressed a willingness to cooperate with Inflight. Pls. Ex. 32. It was not until August 1997 that plaintiffs actually became aware of the possible threat posed by MIF. Then, as the Magistrate found, it was not until September 30, 1997 that plaintiffs realized the extent of the threat when it lost its leading client, American Airlines. It was at that time that the *possible* threat of MIF manifest itself as the *actual* threat. Within two weeks, plaintiffs moved for their temporary restraining order and the instant motion for a preliminary injunction. To the extent the defendants may have suffered any prejudice during this time, the Magistrate also found, and the defendants do not now dispute, that their investment initiated as early as July 16, 1997, well before it was reasonable for the plaintiffs to seek this type of drastic relief. Accordingly, the Court finds that the Magistrate's ruling as to laches was well reasoned and supported in the record and thus any delay is not a bar to granting this injunction. *See also Playboy Enterprises v. Chuckleberry Publ'g, Inc.,* 486 F.Supp. 414, 434–35 (S.D.N.Y.1980) ("parties should not be encouraged to sue before a practical need to do so has been clearly demonstrated").

### 2. Inadequate Remedy at Law

In addition to a showing that the plaintiffs did not unduly delay resorting to injunctive relief, also essential to a showing of irreparable harm is the unavailability or at least inadequacy of a money damages award. *See, e.g., Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (stating "the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies").

The MIF defendants contend that the plaintiffs have not met this requirement because they have failed to submit any evidence that they will go bankrupt if the injunction is not granted and that any business lost to MIF can be assessed at the time of trial by looking at MIF's accounts receivable. Notwithstanding any threat of bankruptcy, however, the law is clear in the Second Circuit that irreparable harm is presumed where a trade secret has been misappropriated. As the Second Circuit declared, "[a] trade secret once lost is, of course, lost forever" and, as a result, such a loss "cannot be measured in

money damages." *FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.,* 730 F.2d 61, 63 (2d Cir.1984) (holding loss of a trade secret is not measurable in money damages); *see also Computer Assocs. Int'l, Inc. v. Bryan,* 784 F.Supp. 982, 986 (E.D.N.Y.1992) (granting a preliminary injunction because loss of trade secrets is not measurable in terms of money damages and is thus considered irreparable harm). As such, the plaintiffs need not establish that they will go bankrupt as the defendants suggest. Rather, they must demonstrate, as they have, that trade secrets have been misappropriated.

### 3. Threatened Disclosure v. Actual Disclosure

■ The defendants raise one final objection with respect to irreparable harm that bears discussion. Defendant Sergi argues that irreparable harm cannot lie where there has been no proof of actual disclosure of the trade secrets or information. Sergi relies on *International Paper Co. v. Suwyn,* 966 F.Supp. 246, 258 (S.D.N.Y.1997), which held that in comparatively low-technology industries, irreparable harm does not exist absent actual disclosure.

In *Suwyn,* however, the court found that there was no risk of disclosure because there was no evidence that the defendant would disclose confidential information in his new position, or that the information would allow the competitor to improve its business with little or no effort, or that the former employees were endeavoring to create an identical product. *See* 966 F.Supp. at 258–59. In this case, on the other hand, the record indicates that defendants Passarelli and Sergi had intimate knowledge of the process of binding the magazines and of the needs and preferences of Inflight's customers, Tr. 281, 411, 427, 428, 453, and that Passarelli felt he could use that information freely. Tr. 466, 467. Passarelli made representations in MIF's proposals that the company was tapping our unique knowledge of both the publishing industry as well as the Inflight entertainment arenas, Tr. 466, 467, and that the new production facility capitalizes on 25 years experience of manufacturing and shipping in-flight amenity products. Tr. 480. *Suwyn* is inapposite be-

cause in this instance, MIF provides *an identical product* to its customers as previously provided by Inflight. In sum, MIF represented to the airlines that their past expertise would be used in formulating competitive bids and providing an identical product.

■ The Court adheres to the rule, therefore, that while the applicant for injunctive relief must establish more than a mere "possibility" of irreparable harm, it need only show that irreparable harm is "likely" to occur. *See JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990); *Frank Brunckhorst Co.,* 875 F.Supp. at 974–75 (citing *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989)). Consequently, the plaintiffs need not establish that the information was actually used, but need only show that the use and disclosure of an employer's protected confidential information is *likely* to occur. *See Lumex, Inc. v. Highsmith,* 919 F.Supp. 624 (E.D.N.Y. 1996); *Ecolab, Inc. v. K.P. Laundry Machinery, Inc.,* 656 F.Supp. 894, 899 (S.D.N.Y. 1987); *Churchill Communications Corp. v. Demyanovich,* 668 F.Supp. 207 (S.D.N.Y. 1987). In this case, the use and disclosure of confidential information, as described *infra,* is likely because there is no dispute that the defendants had access to confidential information concerning, for example, Inflight's binding system, and such information could not have been obtained other than through their employment at Inflight. In addition, MIF provides identical services to its clientele and directly competes with Inflight and the likelihood of use and disclosure is especially strong where the defendants held high positions at both the plaintiffs' and the newly formed defendant companies. *See Giffords Oil Co., Inc. v. Wild,* 106 A.D.2d 610, 611, 483 N.Y.S.2d 104, 105 (2d Dep't 1984). Accordingly, the Court rejects defendant Sergi's argument that actual disclosure is a prerequisite to finding irreparable harm in this case.

### II. DETERMINATION OF TRADE SECRETS

■ Having established the threat of irreparable harm if trade secrets are divulged, the Court must now consider Magis-

trate Orenstein's trade secret determinations. To establish misappropriation of a trade secret, plaintiff must prove that: "(1) it possessed a trade secret, and (2) [defendants are] using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Mgmt. Servs. Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir.1990). In making this determination, the Court is mindful that "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Id.* Magistrate Orenstein's utilization of the six factor test of the Restatement of Torts § 757 was proper, *see id.*, and the analysis was sound.

## A. The Terms of the Proposals and Contracts

■ In his Report and Recommendation, Magistrate Orenstein found that the information contained in Inflight's proposals to the airlines, clients and publishers is entitled to trade secret protection based on the six factors provided in the Restatement of Torts. First, the Magistrate concluded that this information is not known outside of Inflight's business because the proposals contained confidentiality provisions. As a result of working almost fifteen years at Inflight, defendant Passarelli gained insight into the arrangements Inflight had with the airlines, the pricing, the magazine preferences, when and where the magazines were shipped and the terms of the cargo fee arrangements, and which magazine subscription rates were special. The Magistrate also noted that Mr. Passarelli contacted the airlines in a manner which conveyed the impression that he was still associated with Inflight and was providing the same services as he previously did. Second, Mr. Passarelli was the only employee at Inflight who negotiated terms of arrangements with the airlines. Third, Inflight took sufficient measures to protect the secrecy of this information. Fourth, this information was extremely valuable to Inflight and its only competitor, MIF. In this regard, the Magistrate relied on *Support Systems Associates, Inc. v. Tavolacci*, 135 A.D.2d 704, 522 N.Y.S.2d 604 (2d Dep't 1987), in which the court held that pricing and cost information contained in confidential bid proposals was entitled to trade secret protection because if it were known to competitors, they could underbid the plaintiff. Fifth, Inflight must have expended considerable time and effort preparing its bid proposals given that it did not receive the American Airlines request for proposal until September 8, 1997 and was able to provide it to the airline by September 12, 1997. Sixth, and finally, the information in the proposals could not be easily acquired or duplicated by others.

The MIF defendants object to this conclusion on several grounds. First, because Inflight is a monopoly, its trade secrets should not be protected. *National Risk Mgmt., Inc. v. Bramwell*, 819 F.Supp. 417 (E.D.Pa. 1993). The defendants' antitrust argument is discussed *infra*, Section V.

Second, this conclusion is inconsistent with the Magistrate's other finding that Inflight's computer system and the information therein are not trade secrets. In this regard, the MIF defendants point out that the information on Inflight's computer system is the same information they used to prepare their proposals for the airlines. This argument is addressed *infra*, Section II.C.

Third, the MIF defendants argue that the requests for proposals asked for detailed information and specifications and Mr. Passarelli was able to comply because of his own memory and the business intricacies of Inflight. Under *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976), therefore, Passarelli should be allowed to use the skills and knowledge he acquired in his overall experience at Inflight. *See also Abraham Zion Corp. v. Lebow*, 593 F.Supp. 551 (S.D.N.Y. 1984) (mere recollection of customer information is not actionable); *Ivy Mar Co., Inc. v. C.R. Seasons Ltd.*, 907 F.Supp. 547 (E.D.N.Y.1995) (no trade secret protection for customer lists that are recalled or can be obtained by contacting the customer directly). Because Passarelli has not "intentionally memorized customer information" the MIF defendants argue that he is entitled to

use the knowledge and talents he acquired at Inflight. Defendant Sergi adds that pricing decisions are made based on current competitive information and thus the proposals are not entitled to trade secret protection, nor is business information that is merely recalled by the former employee. *Ivy Mar*, 907 F.Supp. at 556; *DataType Int'l, Inc. v. Puzia*, 797 F.Supp. 274, 283 (S.D.N.Y.1992); *Walter Karl, Inc. v. Wood*, 137 A.D.2d 22, 28, 528 N.Y.S.2d 94 (2d Dep't 1988); *Catalogue Serv. Of Westchester, Inc. v. Henry*, 107 A.D.2d 783, 784, 484 N.Y.S.2d 615, 616 (2d Dep't 1985).

The defendants place great emphasis on Mr. Passarelli's personal involvement in every phase of the negotiations while at Inflight. Ultimately, this learned knowledge was instrumental in MIF's preparation of competitive proposals. Defendants unwisely equate this information to customer lists while relying upon *Reed, Roberts* for support. *Reed, Roberts* is inapposite because it involved the use of general customer lists by a former employee in contravention of an anti-competition covenant, where trade secrets were not involved nor at issue on appeal. Defendant Sergi and the MIF defendants thus construe these cases to preclude a finding that Inflight's customer lists are protected. Apparently, they did not fully comprehend Magistrate Orenstein's Report and Recommendation, wherein he specifically found that the names of the clients were not entitled to trade secret protection. Rather, what is protectible, as this Court agrees, is the information contained in the proposals to the airlines, clients and publishers.

The Court agrees with the Magistrate that while Inflight's customers may be readily ascertainable from public sources, its proposal information is not. *See, e.g., Giffords Oil*, 106 A.D.2d at 611, 483 N.Y.S.2d at 106 ("[I]nformation, such as fuel oil capacity of customers' tanks, and the amount certain customers are willing to pay, which aid plaintiffs in establishing prices and which could only be achieved through personal solicitation" is confidential). The only way the defendants could gain access to the information necessary to submit competitive proposals was through their employment at Inflight.

Defendant Sergi also points out that there was no evidence that any of the defendants physically took from Inflight any lists, records or documents relating to proposals, contracts, pricing or costs. The requirement of actual theft, however, arises only when the customer information is not deemed a trade secret, but should be protected because of the departing party's breach of duties to his former employer. *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 391, 328 N.Y.S.2d 423, 427, 278 N.E.2d 636 (1972); *Panther Systems II, Ltd. v. Panther Computer Systems, Inc.*, 783 F.Supp. 53, 66 (E.D.N.Y.1991); *Ecolab Inc. v. Paolo*, 753 F.Supp. 1100, 1111 (E.D.N.Y. 1991). The Court notes that the record in this area is far from clear. There was evidence suggesting that the videotape of Inflight's operations was removed by Sergi, Tr. 296, and that Newton removed his Rolodex from Inflight's premises. Tr. 2111. Because this decision does not turn on whether there was a physical taking by the defendants of Inflight's property, no such finding need be made.

Sergi attempts to distinguish *Support Systems* on the grounds that the defendant in that case was still employed for the plaintiff and assisted in preparing the proposal, and that the proposal was for a highly confidential government bomber contract. Once again, as discussed *infra*, although it is not determinative of this issue, the Court finds that there is sufficient evidence to at least question, if not conclude, that the individual defendants took steps in the planning and preparation of a competitive business after the death of Danny Lehner while still employed at Inflight.

The R & R analyzed the data and language of the proposals to determine a purposeful intent on the part of MIF to undercut Inflight's proposal in price and quality of service offered through the use of deceptive statements. It was not the knowledge of the customers' names or their general needs that rose to trade secret status. Rather, MIF was aware of every facet of Inflight's contracts with every customer, information that included pricing, billing, delivery, product selection, etc. This was not publicly accessible information and it represented current In-

flight data. *Cf. Ivy Mar*, 907 F.Supp. at 558 (finding no trade secret where prices were publicly disseminated and were outdated). Having the exact knowledge of current Inflight pricing afforded MIF an opportunity to underbid and secure the airline contracts.

It is not, as defendants suggest, the pilfering or pirating of Inflight's customer lists that stands as the basis for trade secret protection. Rather, it is the use of all of Inflight's essential and guarded proposal information, garnered by Mr. Passarelli and other defendants during their years at Inflight, to prepare a favorable MIF proposal, that is violative of trade secret protections.

The testimony of Mr. Passarelli makes this conclusion eminently clear. In discussing MIF's negotiations with potential airline customers, it was revealed that MIF only made proposals to airline customers of Inflight. Tr. 555. The proposal to Delta, for example, gave a short biography of the six former "major executives" at Inflight "who had created, produced and implemented the magazine amenity business on board commercial airlines for 20 years." Tr. 556. The terms of the proposal, submitted in response to a detailed Request For Proposal, exactly matched the service provided by Inflight in all aspects including: (1) charging for newspapers and not magazines, Tr. 561; (2) the drop off location, Tr. 562; (3) the contract cycle, Tr. 571–72; (4) providing magazines in a custom Delta binder printed on 12 point coated two side paper stock with an acetate from cover, and a custom fit size, Tr. 574; (5) the location of advertising subject to Delta's content approval, Tr. 576; (6) the labeling of binders with the name and date of the individual publication, Tr. 578; (7) the collation of the magazines into sets, shrink-wrapped in a box and labeled, Tr. 580; (8) the use of a numbered airway bill for tracking the shipments, Tr. 583; (9) delivering on Tuesdays, Tr. 584; (10) delivery of the magazine sets at the same three locations, Tr. 586; (11) the airline COMAT shipping facility, Tr. 587; (12) an identical distribution system, Tr. 589; (13) an identical magazine content screening procedure, Tr. 590–91; (14) proposal information and format, Tr. 591; (15) the magazine titles that were provided free by the publisher which could be provided free to the airlines, T. 593–98; (16) the specific magazine titles, Tr. 608–09. The various airline Request For Proposals differed in the latitude afforded the bidders. United Airlines, for example, described the exact distribution, design and service provided by Inflight and requested a corresponding bid. Tr. 661–678. Having intimate knowledge of the complete Inflight operation, MIF was perfectly positioned to comply.

Mr. Passarelli previously negotiated the specifics of Inflight's proposals, and now Passarelli was able to generate an almost identical proposal for MIF, assuring the customer, in effect, that the service provided to date by Inflight would be replicated by MIF. However, Passarelli was able to go one step better and offer the airline an additional inducement, a nickel per binder in revenue sharing. Tr. 599. Knowing to a high degree of certainty the proposal Inflight would offer, Passarelli requested that MIF's proposals be kept confidential, ensuring an uneven playing field. Tr. 596. If MIF's proposal was not kept confidential and was shared with the competition, Passarelli was concerned that "the competition would have an opportunity to underbid us. I didn't think that would be a fair thing to do." Tr. 659. Additionally, Mr. Passarelli utilized the airline contacts he had formed at Inflight to discuss and submit the MIF proposals. Tr. 637–43. Although the names of customer contacts may be available through directories and trade shows, Inflight's knowledge was not. The only way the defendants could gain access to the cumulative proposal information, which was developed and protected by Inflight through considerable time, expense and effort, was through their employment at Inflight. The Court finds, therefore, that the terms of the proposals and the customer contracts are trade secrets.

### B. *The Customer Lists*

The plaintiffs object to the Magistrate's finding that Inflight's customer lists are not entitled to trade secret protection. The plaintiffs recall testimony supporting the proposition that all of the contacts made by the defendants were the direct result of their

employment at Inflight. The plaintiffs maintain that neither these contacts, nor the World Airline Entertainment Association Directory ("WAEA Directory"), defendants' Exhibit L, were readily ascertainable through public means. Pl. 5. Mr. Passarelli testified that the WAEA Directory is available to all members and membership is available to all who apply and pay annual membership dues. Tr. 736, 737.

The plaintiffs cite *DataType Int'l, Inc. v. Puzia,* 797 F.Supp. 274 (S.D.N.Y.1992) in support of the proposition that Inflight's customer lists were entitled to protection. In *DataType,* however, the defendant conceded at the hearing that the relationships he had developed with specific individuals [customers] constituted protectible proprietary interests of the plaintiff. 797 F.Supp. at 285. All other analysis and language pertaining to the protection of prior customers is *dictum,* and more importantly, no such concessions exist in the instant case.

Plaintiffs' reliance upon *Heyman v. AR. Winarick, Inc.,* 325 F.2d 584, 590 (2d Cir. 1963) is also misplaced. The block quote cited originates in *Franke v. Wiltschek,* 209 F.2d 493, 495 (2d Cir.1953), a case in which the defendants hornswoggled the plaintiffs into hiring them as salespersons, acting not with the intent to sell the product but with the "resolve to copy the product and market it for their own profit." *Id.* at 494. The court further found the plaintiffs' process in issue to be a trade secret. *Id.* at 495. The dissimilarities with the instant action are readily apparent.

The Court finds, as did Magistrate Orenstein, that the evidence introduced at the preliminary injunction hearing supports the conclusion that Inflight's customer lists are not entitled to trade secret protection. It was sufficiently established that the identity of magazine publishers and airline in-flight personnel could be easily ascertained through the use of trade directories, telephone books, the Internet, trade shows, and the magazines themselves. Tr. 927, 929. If these sources did not directly reveal the proper contacts, further inquiry therein would. The volume of magazine distribution at issue would ensure the development of a communication conduit to the necessary party. There is nothing to suggest that either the airlines or the publishers would not welcome new business.

In addition, there were a limited number of key personnel at the airlines with whom Passarelli was in frequent contact and their names, and often their phone numbers, were imbedded in his memory, and thus, not susceptible to trade secret protection. Tr. 939. *See, e.g., Arnold K. Davis & Co., Inc. v. Ludemann,* 160 A.D.2d 614, 616, 559 N.Y.S.2d 240 (1st Dep't 1990) (denying injunctive relief where former employee contacted employer's customers based on his recollection and not a misappropriated list); *Levine v. Bochner,* 132 A.D.2d 532, 517 N.Y.S.2d 270, 271 (2d Dep't 1987) ("It is well established that solicitation of an employer's customers by a former employee is not actionable unless the customer list could be considered a trade secret or there was wrongful conduct by the employee, such as physically taking or copying the employer's files or using confidential information."); *Zurich Depository Corp. v. Gilenson,* 121 A.D.2d 443, 503 N.Y.S.2d 415 (2d Dep't 1986) (finding mere recollection of customers as a result of casual memory is not actionable); *see also Jad Corp. of America v. Hico Corp. of America,* 335 F.Supp. 66, 69 (S.D.N.Y. 1971) (no unlawful conduct where the information emanated from continuous calls to prospective customers and not on the basis of a "purloined customer list").

Finally, this is not an instance where the customer lists were gained through extraordinary effort or expensive advertising by Inflight. *See Consolidated Brands, Inc. v. Mondi,* 638 F.Supp. 152, 156 (E.D.N.Y.1986); *AGA Aktiebolag v. ABA Optical Corp.,* 441 F.Supp. 747, 754 (E.D.N.Y.1977); *Leo Silfen,* 29 N.Y.2d at 392–93, 328 N.Y.S.2d 423, 278 N.E.2d 636. One does not have to look far and wide to determine the identity of magazine publishers or airlines. All magazine publishers have subscription and circulation departments that regularly deal with bulk and trade customers and all airlines have personnel who interface with in-flight service providers. It is also important to note that the various airline request for proposals indi-

cated the name and address of the contact person. Accordingly, the Court finds that the identity of the personnel at the publishers and airlines with whom Inflight conducted business, i.e., the customer lists, are not trade secrets.

## C. The Computer System

The MIF defendants further assert that a finding of a trade secret in the proposals is incongruous with the Magistrate's determination that the computer system and the information therein is not accorded trade secret protection. Plaintiffs join this position from the opposite spectrum. As the proposal information was contained within the computer system, the proposal, the defendants aver, cannot be protected. Conversely, as the proposal was deemed a trade secret, plaintiffs maintain that the computer system, as the repository of the proposal information, should be equally protected.

These arguments, although logically sound on their face, misconstrue the R & R's meaning. What is encompassed within the Inflight computer system is the hardware, software, and system arrangement, including the specific programs, menus and database configurations—the Aviion system itself. This is not a protected trade secret. The component parts were off the shelf items, purchased approximately fifteen years ago. In an industry where obsolescence is measured in seasons and not years, the hardware was not entitled to trade secret protection.

As to the configuration of the software databases, programs and menus, it is necessary to consider the ease or difficulty of duplication. *See Integrated Cash Mgmt. Servs. Inc. v. Digital Transactions, Inc.*, 732 F.Supp. 370, 376 (S.D.N.Y.1989). Relevant considerations include the technical complexities embodied in the original system and the extent to which the duplicate system is significantly similar in design and function. More important, perhaps, is the former employees' level of input into the design. A general conceptual goal incorporating specific needs and wants in the form of instructions for a programmer, is far different than the former employer redesigning, programing and upgrading the previous system for his new employer. For example, in *Integrated,* the former employees actively participated in writing the programs at issue for their prior employer, and notwithstanding the court's belief that the programs were not consciously copied, the employees' knowledge and skill made duplication a simple task. *Id.* at 375. Additionally, that court heard expert testimony concerning the many "similarities in the structure functionality, organization and logic flow between" the two programs, before granting injunctive relief. *Id.* at 378.

In this case, the Court recognizes that the replication of Inflight's system, either via copying or duplication would have been a simpler, quicker task than developing the system from the ground up. Although the defendants brought the skill, knowledge and expertise they amassed as employees of Inflight to bear when outlining the design of MIF's computer system, nevertheless, MIF's specific programs and modules were developed by an independent computer consultant. Anthony DeCristofaro was hired as an independent consultant to design MIF's computer system. Unlike the majority of MIF's employees, DeCristofaro had never worked for Inflight, nor was he familiar with the airline or publishing business. Tr. 1322, 1324. DeCristofaro was hired to design a database magazine distribution system to track shipping, receiving, and billing and to generate proposals. Tr. 1334. DeCristofaro testified that he was only provided with verbal information and hand drawn sketches from the defendants toward this end, and that he did not receive any computer disks, CD–ROMs, hard drives or other computer data media. Tr. 1329, 1342. He did not use any portion or product of the Aviion system, Tr. 1346, rather, using a computer language unavailable fifteen years ago, DeCristofaro wrote the code needed for the program. Tr. 1343. Although he never created identical programs, DeCristofaro's experience developing similar database manipulation programs was sufficient for the task at hand. Tr. 1365. Plaintiffs never presented testimony of fact or expert witnesses indicating the similarity of MIF's system, programs, menus or screens to that of Inflight. Although the two systems may accomplish the same ends,

they apparently arrive there through different means.

When addressing the information within the computer system, the R & R also found: "[a]s to the extent that the data entered into the computer system was known outside of Inflight, this Court finds that the information regarding the customers (airlines) and the publishers is readily available." This only iterates what the R & R previously held. Because the customer lists are not protected, therefore, to the extent the customer lists constitute data within the computer system, it remains unprotected. It is the Court's belief that the opposite is true as well. If the data entered into the computer system includes protected trade secrets, that shield is not relinquished when the data takes the form of bits and bytes. Moreover, as explicated *supra*, it is the aggregation of the terms of Inflight's shipping, pricing and delivery, and more importantly, MIF's knowledge of Inflight's specific methods of operation that allowed MIF to prepare favorable proposals worthy of trade secret status, and this information is not wholly encompassed within the computer system. Although there was testimony suggesting that computer information and files may have been removed, perhaps in the closed briefcase that regularly appeared after Danny's death, Tr. 1534, the evidence was insufficient to conclude that Inflight computer files were retained or pilfered by the defendants. Without the utilization of Inflight's computer data or files, MIF created its own computer system. The Court therefore finds that the Aviion computer system is not entitled to trade secret protection.

### D. *The Binding Process*

██ With respect to the binding process and machinery used by Inflight, Magistrate Orenstein found that the machines used by Inflight, in their modified state, were trade secrets. Magistrate Orenstein also found that the binding process as a whole are protectible trade secrets, this includes the overall combination of Sulby machines, window machines, inkjet printers, glue pots, paper stock, plastic mil, glue formula. As a preliminary matter, the MIF defendants completely misread the Magistrate's R & R when they state that the Magistrate made the "erroneous conclusion that the equipment at Inflight in its *unmodified* state is a trade secret." Defs. 6 (emphasis added). Magistrate Orenstein's finding, however, was that the mere use of these machines and materials as they were initially obtained by Inflight were off-the-shelf and thus not protected trade secrets. Rather, it was in their *modified* state that these products were given their trade secret protection.

In addition, the MIF defendants argue that the Magistrate improperly rejected all of their expert testimony and relied solely on plaintiff's expert, Luis Rivera, in concluding that the equipment was modified in a way to be a trade secret or that the process itself was protectible. First, the R & R refers to the substantial amount of time and money Inflight expended in putting the binding process together, yet defendants suggest that there was no testimony or evidence regarding any time or expense in connection with the selection of the equipment, modifications and purchase of raw materials. Despite this contention, however, the Court finds that testimony was introduced that throughout Inflight's operation the binding system was repeatedly modified and changes were made in selecting the proper thickness of the mil for the paper and other products. Tr. 73–90.

Second, the MIF defendants point out that their expert testified that ink jet technology has existed for over 30 years and is widely used in different industries and that plaintiffs' ink jet machine was a stock machine and contained no modifications. The Magistrate found, however, and the MIF defendants do not now controvert, that the inkjet printers were added to the existing machines, along with other parts to keep the cover steady to achieve straight imprinting. Tr. 81, 83. Nor does defendants' expert Mr. Hawkin's testimony controvert that Inflight experimented with the best way to place and affix the inkjet on its Sulby machine. Tr. 85. Rather, the defendants merely point out that inkjet technology is widely used and that the inkjet itself (not as attached or affixed to the printer) was a stock machine. Moreover, Mr. Hawkin's testimony that the method of

affixing the inkjet is not a trade secret is a legal conclusion that does not bear on this Court's determination of whether it is protectible, nor does his vague and general comment that the plaintiffs' inkjet was being used in a standard binding process hold much weight. Likewise, Mr. Ward's testimony that the method of attaching the inkjet to the Sulby machine could be easily performed. Tr. 2082, does not mean that it is not a modification conjured and implemented solely by Inflight.

Third, the MIF defendants argue that the window machine and Sulby machines were not modified so as to attain trade secret protection. The only basis for this objection is that these were stock machines and Mr. Rivera's statement that these machines could "do the job" without modifications. Tr. 139. The MIF defendants do not address, however, the specific testimony from Mr. Rivera that the window machine was modified to get two streams of covers, doubling up the production of the covers or that the idea to use the window machines in the process came from Mr. Lehner. Tr. 78. Similarly, the MIF defendants fail to address Mr. Rivera's testimony that Inflight experimented with several different Sulby models, and upon deciding on the Compact 88 model, made modifications to add a protective guard around the carousel to avoid employee accidents. Tr. 82. The MIF defendants only controvert this testimony with their expert, Mr. Ward, who testified the Sulby Compact 88 was fifteen years old, and was therefore out of date, and that it was stock machinery with no modifications. Tr. 2071. Mr. Rivera specifically testified, however, that certain modifications mere made, including the following: (1) applying only melted glue from the glue pots, Tr. 83; (2) increased capacity of the glue pot, Tr. 84; (3) addition of a piece to the machine to reduce the noise and dust created by the Sulby's blade, Tr. 88; and (4) turning the plastic cover in a manner as to avoid static electricity. Tr. 86. Even absent the ability to assess credibility, the Court concludes that Mr. Rivera's specific and detailed examples of modifications to the Compact 88 belies Mr. Ward's general statement that no modifications were made. Moreover, when Mr. Ward was informed of the annual production of 30 million magazine covers per year he recommended the use of a machine that costs approximately one million dollars. Tr. 2103–05. Had the defendants not been privy to Inflight's operations and had instead consulted with Mr. Ward prior to production, it is unlikely that they would have chosen the economical Sulby 88.

Fourth, the MIF defendants also claim that their expert's uncontroverted testimony reveals that the glue used was off the shelf with no special ingredients. Tr. 2067. Mr. Rivera specifically testified, however, that Inflight had experimented with a number of different glues and decided the combine two brands, H.B. Fuller and Mercury Adhesives, in a specific percentage to blend a cost-effective, yet efficient adhesive. Tr. 85.

Fifth, the MIF defendants challenge the Magistrate's finding that the binding process itself is entitled to trade secret protection. Magistrate Orenstein found that the combination of the uses of the modified equipment as a whole process was entitled to trade secret protection, relying on a number of cases. *Integrated,* 920 F.2d at 174; *Imperial Chemical Indus. Ltd. v. National Distillers & Chemical Corp.,* 342 F.2d 737 (2d Cir. 1965); *Monovis, Inc. v. Aquino,* 905 F.Supp. 1205 (W.D.N.Y.1994); *Bryan,* 784 F.Supp. at 988; *see also Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.,* 118 F.3d 955, 968 (2d Cir.1997) (remanding case to district court to consider whether manner of combination of various design elements is a trade secret).

The defendants contend that the process of binding the magazines is not secret because their experts testified, by merely looking at court transcripts also with plastic covers and comparing them to Inflight's bound magazines, that the same process was used to bind all of them. Once again, it is not the finished product at issue but the process by which it results. For Inflight, this process was developed over the years through trial and error.

The MIF defendants also argue that because their expert, Mr. Ward, never required non-disclosure agreements for employees of his binding factories, this somehow leads to the conclusion that Mr. Lehner's decision to

use non-disclosure agreements is linked to an underlying plan to secure a monopoly. This conclusory allegation is unsupported in the record and bears no relevance to whether Inflight's binding process is entitled to trade secret protection. Rather, the MIF defendants objections to the Magistrate's finding with respect to the binding process are nothing more than conclusory when compared to the detailed testimony from Mr. Rivera as to the specific ways in which Inflight, through its years of experience and experimentation, modified and developed its binding process. It is noteworthy that MIF requires its employees to sign employment contracts with confidentiality and non-disclosure clauses and similar confidentiality and non-disclosure agreements. Tr. 294, Pls.Exs. 22, 31A.

For these reasons, the Court also rejects the nearly identical objections of defendant Sergi to the Magistrate's conclusion on this issue. Defendant Sergi does raise several different objections, all of which are similarly unpersuasive. First, he argues that Inflight did not take enough precautions to guard the secrecy of the process because the doors to the parking lot were left open and unguarded. Tr. 41–44. As the Magistrate correctly noted, however, absolute secrecy is not necessary. In this case, Inflight took other significant steps to guard the secrecy of the modified machines, including the use of non-disclosure statements for employees and guests, to satisfy the secrecy element to obtain trade secret protection. *See, e.g., Vermont Microsystems, Inc. v. Autodesk, Inc.,* 88 F.3d 142, 150 (2d Cir.1996) (requiring non-disclosure statements is enough to find that secrecy requirement has been met). To the extent that Sergi argues he was not bound by that agreement, that argument is addressed in detail *infra* and is rejected.

The plaintiffs, in objection, contend that the overall "know-how" of Inflight should be deemed a trade secret and protected. At the preliminary injunction hearing, there was a comprehensive examination of the business and operations of Inflight and Magistrate Orenstein properly distinguished those elements deserving of trade secret protection. To find the all-inclusive, yet nebulous, term "know-how" to be a trade secret would undermine the specific determinations made at the hearing To the extent that the "know-how" is encompassed within the binding process or the customer proposals and contracts, it is already protected. There is no basis in the record, however, to conclude that any general knowledge not previously addressed in this decision must be protected as well.

The MIF defendants object to Magistrate Orenstein's finding that *Inflight Advertising, Inc. v. Bindit Corp.,* 76 A.D.2d 857, 428 N.Y.S.2d 512 (2d Dep't 1980) stands for the proposition that the binding process is a trade secret. Tr. 2391. Neither the Magistrate nor the Court predicated the trade secret determination on this prior action. However, it is relevant as it represents a judicial determination of the enforceability of the restrictive covenant. The defendant, Klaus Leuders, was employed at Inflight and signed an identical non-disclosure/non-compete covenant to the one at issue in the instant action. The defendant was only employed at Inflight for three months before being terminated for a suspicious incident, at which time he returned to his prior employer. The court upheld the restrictive covenant and granted an injunction against the defendant "for a period of two years from the time of the cessation of the defendant's employment with the plaintiffs within the geographical limitations as provided in the Non–Disclosure Statements executed by the defendant, Klaus Lueders, with the plaintiffs herein." *Inflight Advertising, Inc. et ano. v. Bindit Corp. et ano.,* No. 79 Civ 2653, p. 6 (Nassau County Sup.Ct., Kelly, J.1979). The Magistrate did not err, therefore, in considering the prior decision.

Finally, all defendants point out that Inflight made a videotape of its process, which was shown to prospective clients, advertising clients, publishing clients and airlines clients and any of "Mr. Lehner's sink (sic) organizations as well as friends." Tr. 879. The Court has viewed the videotape and the footage provides scant observations of the binding process. The camera pans across the facility and specifics regarding the machines cannot be observed. Luis Rivera's testimony is in accord, and in addition, he testified that he never showed the video to anyone who

**134**

had not signed a non-disclosure agreement. Tr. 890, 891, 892.

Accordingly, the Court adopts the Magistrate's finding that both the binding equipment, as modified by Inflight, and the binding process itself are protected trade secrets.

### III. USE OF THE NAME MAGAZINES-IN–FLIGHT AND ITS LOGO

In their objections, the MIF defendants expressly state that "for the purposes of this proceeding, defendants will consent to a preliminary injunction enjoining their use of the name and logo." Defs. 17. The Court agrees and accordingly, the defendants are enjoined from using the name Magazines In–Flight or the logo presently associated with it.

### IV. THE NON–DISCLOSURE AGREEMENTS

#### A. *General Enforceability*

The law is well established that restrictive covenants will be enforced only if reasonably limited in scope and duration, and then only to the extent necessary to protect the employer from unfair competition resulting from the use or disclosure of trade secrets or confidential customer lists, or if the former employee's services are unique or extraordinary. *Lumex,* 919 F.Supp. at 628; *Columbia Ribbon & Carbon Mfg. Co. v. A–1–A Corp.,* 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 369 N.E.2d 4 (1977); *Reed, Roberts,* 40 N.Y.2d at 307–08, 386 N.Y.S.2d 677, 353 N.E.2d 590. Although non-competition agreements are strictly construed in New York, the courts have repeatedly enjoined employees from breaching reasonably limited agreements. *See South Nassau Control Corp. v. Innovative Control Management Corp.,* No. CIV. 95–3724, 1996 WL 496610 (E.D.N.Y. June 20, 1996); *Innovative Networks Inc. v. Satellite Airlines Ticketing Centers, Inc.,* 871 F.Supp. 709, 728 (S.D.N.Y. 1995); *Gelder Medical Group v. Webber,* 41 N.Y.2d 680, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977); *Reed, Roberts,* 40 N.Y.2d at 307–08, 386 N.Y.S.2d 677, 353 N.E.2d 590; *Columbia Ribbon,* 42 N.Y.2d at 499, 398 N.Y.S.2d 1004, 369 N.E.2d 4; *Schachter v.*

*Lester Witte & Co.,* 52 A.D.2d 121, 383 N.Y.S.2d 316 (1st Dep't 1976) *aff'd* 41 N.Y.2d 1067, 396 N.Y.S.2d 175, 364 N.E.2d 840 (1977); *Chernoff Diamond & Co. v. Fitzmaurice, Inc.,* 234 A.D.2d 200, 651 N.Y.S.2d 504 (1st Dep't 1996); *Maltby v. Harlow Meyer Savage, Inc.,* 223 A.D.2d 516, 637 N.Y.S.2d 110 (1st Dep't 1996); *Deloitte & Touche, L.L.P. v. Chiampou,* 222 A.D.2d 1026, 636 N.Y.S.2d 679 (4th Dep't 1995); *Briskin v. All Seasons Servs., Inc.,* 206 A.D.2d 906, 615 N.Y.S.2d 166 (4th Dep't 1994); *Mallory Factor Inc. v. Schwartz,* 146 A.D.2d 465, 536 N.Y.S.2d 752 (1st Dep't 1989); *Composite Panel Fabricators, Inc. v. Webb,* 118 A.D.2d 615, 499 N.Y.S.2d 765 (2d Dep't 1986); *Walter Rubin Inc. v. First Coinvesters, Inc.,* 91 A.D.2d 630, 456 N.Y.S.2d 813 (2d Dep't 1982); *Sackman v. Maritas,* 156 Misc.2d 939, 595 N.Y.S.2d 655 (Sup.1992); *Garvin GuyButler Corp. v. Cowen & Co.,* 155 Misc.2d 39, 588 N.Y.S.2d 56 (Sup.1992).

In the present case, all of the individual defendants with the exception of defendant Sergi were required to sign two identical versions under the headings, Inflight Advertising, Inc. and Inflight Newspapers, Inc. The non-disclosure/non-compete agreements provide as follows:

### NON–DISCLOSURE STATEMENT

The undersigned does hereby acknowledge that in the course of his dealings with this company, including but not limited to his solicitations, conferences, sales presentations and sales investigations, that certain trade secrets, methods, ideas and the like, will be or have been imparted to him.

The undersigned does hereby agree that any such information that comes to him by reason of his contact and solicitation of this company, shall remain the exclusive property of the above named company.

You agree that you will not engage in the same avocation in the same industry as the above named company, as an employee, stockholder, partner or otherwise, for a period of two years after termination of your contact with this company, within a reasonable geographic location of the following territories:

| | | |
|---|---|---|
| California | Illinois | Massachusetts |
| Connecticut | New Jersey | Washington, D.C. |
| Florida | New York | |

The undersigned does further agree that the information, methods, trade secrets, ideas and the like, have been imparted to him solely by reason of your solicitation of this company and use of same shall only be authorized by written communications from the above named company.

It is agreed that any violation by you or any employer, partnership and or corporation to which you may become associated with, entitles the above named company to injunctive relief and damages at law from you or any employer, partnership and/or corporation to which the undersigned may become associated with.

■ The only objection that the MIF defendants raise to the enforceability of this agreement is that it is vague, indefinite and overbroad, and therefore must be construed against Inflight. Reviewing the agreement as a whole, however, the Court finds nothing vague of indefinite about its terms. It plainly and simply prohibits Inflight's employees from competing in the same industry or from using any of Inflight's trade secrets without written authorization. The Court also notes that the duration of two years and the geographic scope limiting the enforceability of the non-compete clause to seven states and the District of Columbia is reasonable. *See, e.g., Webcraft Technologies, Inc. v. McCaw,* 674 F.Supp. 1039, 1045–46 (S.D.N.Y.1987) (where company engages in unusual, specialized business, enforcement of a "broad worldwide covenant not to compete or solicit customers" for a period of two years is reasonable.); *Gelder Medical Group v. Webber,* 41 N.Y.2d 680, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977)(upholding five year covenant); *Bates Chevrolet Corp. v. Haven Chevrolet,* 13 A.D.2d 27, 213 N.Y.S.2d 577 (1st Dep't 1961)(upholding five year non-solicitation agreement).

### B. *Applicability to Defendant Sergi*

Defendant Sergi challenges Magistrate Orenstein's determination that he is bound by the non-disclosure/non-competition agreement, notwithstanding the fact that he never signed it. The R & R found that Mr. Sergi and two other key defendants, Newton and Passarelli were "well aware of the policy and are thereby deemed to have assented to the terms and conditions of the agreement." Moreover, they were persons who enforced such terms and conditions on other employees.

■ The discrete issue remains, therefore, whether Sergi's failure to sign the agreement means that he is not bound by its terms. The Court initially notes that defendant's selected citation to the language of *American Broadcasting Cos. Inc. v. Wolf,* 52 N.Y.2d 394, 438 N.Y.S.2d 482, 487, 420 N.E.2d 363 (1981) is duplicitous. The use of ellipsis to conceal relevant language will not obscure the opinion's true meaning. That case does not stand for the proposition that only an express non-competition covenant will be sufficient for a court in this state to enjoin post employment activity. Rather, the court in interpreting a general contract negotiation clause, and not a non-competition covenant, declared the availability of equitable relief to "prevent injury from unfair competition or similar tortious behavior," *id.* 438 N.Y.S.2d at 487, whether the covenant is express or implied. *Id.* at 488 n. 9. The court clearly stated, "[o]nly if the employee has expressly agreed not to compete with the employer following the terms of the contract, *or is threatening to disclose trade secrets* or commit another tortious act, is injunctive relief generally available at the behest of the employer." *Id.* at 486. (emphasis added). MIF's use of Inflight's trade secrets threatens Inflight's economic viability and continued existence, and therefore suffices to hold Sergi to the terms of the agreement for purposes of injunctive relief.

Although Sergi attempts to distinguish the cases cited in the R & R, the similarities appear more persuasive. In *American Federal Group, Ltd. v. Rothenberg,* No. Civ. 91–7860, 1996 WL 282059 (S.D.N.Y. May 28, 1996) and *Harry R. Defler Corp. v. Kleeman,* 19 A.D.2d 396, 243 N.Y.S.2d 930 (4th Dep't 1963) the defendants may have acted in a more brazen fashion in furtherance of their illicit goals, however, the law does not turn on the openness or the timing of the viola-

tors' behavior. In *American Federal*, the defendant Rothenberg, a key employee and officer of the plaintiff's corporation was aware of the non-competition policy, had advised subsequent employees that execution of the agreement was a condition of employment but never signed the agreement himself. In holding Rothenberg to the terms of the agreement, the court cited his knowledge and continued relationship with the employer "gave rise to a contract implied in fact." *American Federal*, 1996 WL 282059 at *13. Although Rothenberg was also a director of the plaintiff corporation, this was not a determinative factor as the logic and reasoning of the decision did not turn on his corporate status but rather on satisfying the elements of a contract implied in fact.

The evidence presented at the hearing supports the belief that the individual defendants entered into preliminary discussions about, and took affirmative steps in furtherance of, the start-up of MIF, prior to their respective terminations and resignations from Inflight.[2] Additionally, the defendants used Inflight funds to pay for such legal fees. Tr. 316, 369, 506, 507. The defendants also marketed MIF in a manner intended to utilize the goodwill and reputation of Inflight to divert business from Inflight to MIF. Tr. 529, 530, 531, 536, 540, 555, 556, 562, 934, 1807, 1823, 1824.

Moreover, Sergi was employed at Inflight prior to the implementation of the non-disclosure policy, and although he was not a signatory to the agreement, he was responsible for and was diligent in ensuring that all who entered Inflight and were exposed to the binding process signed the agreement. Tr. 17, 47, 60, 93, 94. As a key employee, fully cognizant of the measures taken to maintain Inflight's trade secrets, it strains credulity to

---

**2.** Taken in the aggregate, the following are sufficient to establish the defendants' prior planning and preparation of MIF. For example, Linda Horan testified that on the week of Daniel Lehner's death, Passarelli told her "Inflight would continue, if not at the location we were at now." Tr. 18. That same week, Passarelli asked Horan to "get rid of his nondisclosure form from his personnel file." Tr. 19. Horan was informed by Sergi and Passarelli, "any kind of request that she [Remy Lehner] asks of me, that I should go through them." Tr. 28. Sergi, Passarelli, and Newton would often meet outside the earshot of Remy Lehner. Tr. 28, 29. Sergi asked Erwin Solares, two days after Lehner died, to make a videotape of the complete Inflight plant with a camera and tape provided by Sergi. Tr. 65, 69. Luis Rivera testified that approximately one week after Lehner's death, Sergi told Rivera "that he will like for me to work with him no matter what he had to do," prompting Rivera to reply "I was going to stay with Inflight." Tr. 96. On the day Sergi resigned he informed Ephraem Seedansingh "I'll certainly be in touch and whatever I do there will be a place for you." Tr. 188. Remy Lehner testified that Passarelli told her approximately one week after Daniel Lehner's death that "he was going to hurt the business and he said that he had American Airlines" Tr. 319. Remy further testified that Sergi, Newton and Passarelli would regularly meet without her and scatter if she walked into the room. Passarelli wouldn't allow Remy to write to customers unless she signed an employment contract. Tr. 322. Passarelli informed Remy that unless they were given employment contracts with significant raises, or allow them to buy a substantial piece of Inflight, they would take away the business. Tr. 324. During the interim they weren't returning phone calls or taking care of business.

Tr. 325. Stephen Mason, Esq. testified that on June 26, 1997, he spoke with Mr. Kenneth Godt, Esq. who represented the defendants Passarelli, Newton and Sergi and was informed of three proposals: (1) the defendants would enter into long term employment contracts and be allowed to run the company; (2) the defendants would buy out Remy; (3) the defendants would leave and take 70% of the business. Tr. 774, 842. Mr. Sergi, while still employed at Inflight met with Passarelli, Newton, Guido, and Antonelli and discussed the formation of a competing venture on July 14, 1997. Tr. 1022. Ms. Antonelli testified that she informed Mr. Passarelli, a few days after Mr. Lehner's wake that Remy indicated he would be fired. Tr. 1404, 1457. Passarelli informed Antonelli not to worry about the non-compete agreement, as he had spoken to an attorney about it. Tr. 1470. Antonelli told Jorge Martinez in the days prior to her resignation that she was leaving, and was going to take the Shuttles. Tr. 1568, 1569. She also stated that the name Magazines–Inflight was determined before she came on board. Tr. 1568.

As well, the celerity with which the defendants established MIF, supports the belief that it was a previously planned venture. Curiously, the Minutes of the Board of Directors meeting of MIF, dated July 16, 1997, utilizes the address 191 Hanse Avenue, Freeport. Pl.Ex. 33. The Certificate of Incorporation Of MIF was filed on July 15, 1997. Pl.Ex. 59. An MIF bank account was established on July 15, 1997. Tr. 1205. Kenneth Godt called Mr. Weinberg in Albany on July 14, 1997, to reserve the corporate name Magazines In–Flight. Tr. 1274. The defendants purchased $12,000.00 of computer equipment on July 15, 1997. Tr. 1981.

imagine that Sergi believed the agreement did not apply to him, and that he was free to disclose and utilize Inflight's trade secrets for his personal gain.

Furthermore, "an employee's use of an employer's trade secrets or confidential customer information can be enjoined even in the absence of a restrictive covenant when such conduct violates a fiduciary duty owed by the former employee to his former employer." *Churchill,* 668 F.Supp. at 211; *see also Speedry Chemical Products, Inc. v. Carter's Ink Co.,* 306 F.2d 328, 332 (2d Cir.1962); *McKay v. Communispond, Inc.,* 581 F.Supp. 801, 806 (S.D.N.Y.1983); *Velo–Bind, Inc. v. Scheck,* 485 F.Supp. 102, 109 (S.D.N.Y.1979); *Royal Carbo Corp. v. Flameguard, Inc.,* 229 A.D.2d 430, 645 N.Y.S.2d 18 (2nd Dep't 1996) (finding employees who organized competing business while still employed by plaintiff were not entitled to compensation during that period and owed damages for lost profits from diverted accounts); *Props for Today, Inc. v. Kaplan,* 163 A.D.2d 177, 558 N.Y.S.2d 38 (1st Dep't 1990) (misappropriation of confidential information consisting not only of publicly available customer list but client interests and needs and accommodating distributors was sufficient to enjoin former employee who initiated a competitive business but had not signed a non-competition agreement); *Advance Biofactures Corp. v. Greenberg,* 103 A.D.2d 834, 478 N.Y.S.2d 344, 346 (2d Dep't 1984).

Additionally, the Restatement (Second) of Agency, Section 396(b) provides in pertinent part:

Using Confidential Information after Termination of Agency.

Unless otherwise agreed, after the termination of the agency, the agent:

(b) has a duty to the principal not to use or to disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty.

The Court finds, therefore, that there is a sufficient legal basis to uphold the application of the terms and conditions of Inflight's restrictive covenant to defendant Sergi.

Mr. Sergi avers, however, that the effect of the restrictive covenant is to deprive him of a livelihood. No evidence in the record is cited in support of this contention. The skills Sergi developed in his over twenty-five year employment as Vice–President and Chief Operations Officer at Inflight include, at the very least, general managerial skills valuable within the publishing and distribution industry. If Sergi and the other defendants desired to undertake an equivalent venture, they could have relocated to any one of the forty-two non-specified states without violating the express terms of the agreement.

### C. *Restrictive Covenant and Inflight's Customers*

The plaintiffs maintain that even if Inflight's customer contact information is not a trade secret, it is protectible under the terms of the restrictive covenants because it is confidential and because the individual defendants were employees of Inflight. As stated earlier, the Court finds that the agreement prohibits Inflight's employees from competing in the same industry or from using any of Inflight's trade secrets without written authorization. The agreement does not contain an express proscription on contact with prior customers, as is found in the cases plaintiffs cited. *See Bijan Designer for Men, Inc. v. Katzman,* 1997 WL 65717, 1997 U.S.Dist. LEXIS 1426 (S.D.N.Y.1997) ("not call on, solicit, take away or otherwise contact, except as instructed by employer, any individuals who are or were customers of employer during the term hereof"); *Lumex,* 919 F.Supp. at 625–26 (forbidding the use of confidential information defined as including customer lists and customer usages); *Innovative Networks,* 871 F.Supp. at 714 ("all business leads developed during the course of employment ... shall be the property of the Employer and all of the foregoing is designated and agreed to be 'Privileged Information' ... agrees that he shall not directly or indirectly utilize any of the Privileged Information"); *Columbia Ribbon,* 42 N.Y.2d at 498, 398 N.Y.S.2d 1004, 369 N.E.2d 4 ("Employee will not during his employment

or after the end thereof, ... directly or indirectly, disclose to any person, firm or corporation, the name, address or requirements of any customer or prospective customer of the Company"); *Service Systems Corp. v. Harris,* 41 A.D.2d 20, 21, 341 N.Y.S.2d 702, 703–04 (4th Dep't 1973) ("for a period of three years subsequent to the termination of his employment, appellant would not solicit the maintenance of any building which had been managed or supervised by the respondent"). As discussed *supra,* the customer lists were readily ascertainable and do not constitute trade secrets or confidential Inflight information.

Having expressly found Inflight's customer contacts to not constitute a trade secret, such customer lists are not protected under the terms of the covenant. This is completely consistent with the Court's determination that the individual defendants violated the non-competition agreement. For example, assume the defendants decided to supply portable CD audio players and the latest titles on disc to the airlines for inflight services, and in furtherance thereof, contacted Inflight's customers, specifically the individuals in charge of in-flight services at the various airlines, to promote their new and unrelated product. The defendants would be utilizing the contacts established while employed by Inflight, but would not be "engaged in the same avocation (sic) [obtaining magazines and newspapers from publishers, binding the magazines into plastic covers and distributing the magazines and newspapers to airlines for their passengers to read during flights] in the same industry, as [Inflight]," and therefore would not be in violation of the restrictive covenant. To suggest that the defendants could not contact Inflight's customers for any business purpose would be to elevate the customers themselves to trade secret status, and would empower the customer lists with a level of confidentiality not found by the Magistrate or this Court. Although it is true that "restrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information," *Reed, Roberts,* 40 N.Y.2d at 307, 386 N.Y.S.2d 677, 353 N.E.2d 590,

where confidentiality has not been adequately established, the customer lists will not fall within the agreement's umbrella of protection.

## D. Applicability to Defendant Dykstra

The MIF defendants make a perplexing and incoherent objection to Magistrate Orenstein's findings with respect to defendant Jody Dykstra. Specifically, the Magistrate concluded that Jody Dykstra or MIF acted with a specific predatory intent to steal certain accounts which would purchase advertising space. Tr. at 2404. The MIF defendants assert that there is nothing wrong with Ms. Dykstra soliciting prospective customers whose names and whereabouts are readily known and available throughout the industry. Ms. Dykstra and all the individual defendants have violated the non-disclosure/non-compete agreements they executed, however, her specific role is not so critical as to merit further discussion.

## V. THE PLAINTIFFS AS MONOPOLISTS

Because Inflight is a monopoly, the defendants urge that the plaintiffs are not entitled to the relief requested. This assertion, unsupported by legal precedent, is grounded in the belief that as a purported monopoly, under the Sherman Act, Inflight was not at liberty to terminate its employees because those employees, having skills and experiences limited to this field, would be unable to find employment and therefore were forced to start a competitive business.

The court acknowledges that employee agreements not to compete are proper subjects for scrutiny under the Sherman Act. *Newburger, Loeb & Co., Inc. v. Gross,* 563 F.2d 1057, 1082 (2d Cir.1977). On the other hand, post-employment restraints do serve legitimate business purposes in preventing a departing employee from misappropriating his former employer's trade secrets and clientele. *See id.* To ascertain whether such agreements rise to the level of antitrust injury, a two-part inquiry is required: (1) will the restrictive covenant operate in circumstances where *no valid business interest of*

the ex-employer is at stake? and (2) are the restrictions so burdensome that their anti-competitive purposes and effects outweigh their justifications? *Id.*

In this case, the restrictive covenants are limited solely to trade secrets, as the Court has found above, developed while the employee worked for Inflight and was exposed to its process for binding magazines and newspapers. Moreover, the non-competition clause is limited to employment in the same industry. In this limited context, the Court finds that Inflight has a legitimate interest in curtailing its former employees from working for a competing company, especially in light of the finding that trade secrets are involved and that there is a likely threat of their disclosure by the defendants.

It is only after determining that a restrictive covenant would serve to protect against unfair and illegal conduct and not merely to insulate the employer from competition, does the reasonableness of the covenant in terms of its "time, space or scope" or the oppressiveness of its operation become an issue. *American Institute of Chemical Eng'rs. v. Reber–Friel Co.*, 682 F.2d 382, 387 (2d Cir.1982) (citation omitted). Having determined that the restrictive covenants serve a legitimate purpose to protect against the misappropriation of trade secrets, the reasonableness of the covenants is relevant. As discussed above, however, the two year duration and limited geographic restrictions are reasonable and thus do not prevent the enforcement of the agreements.

Defendant Sergi cites *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377, 93 S.Ct. 1022, 1029, 35 L.Ed.2d 359 (1973); *Schine Chain Theatres v. United States*, 334 U.S. 110, 118, 68 S.Ct. 947, 952, 92 L.Ed. 1245 (1948); *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948) for the proposition that an employer cannot enforce an anti-competition agreement to gain competitive advantage. For example, in *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*, 351 F.Supp. 462, 508 (E.D.Pa.1972), the court held that a three year restraint following expiration of the employment contract was unreasonable and in violation of the Sherman Act. The MIF defendants rely on *National Risk Mgmt., Inc. v. Bramwell*, 819 F.Supp. 417 (E.D.Pa.1993), although the court therein did not undertake antitrust analysis but merely recited the similar requirements for establishing the existence of trade secrets before a restrictive covenant will be enforced.

The protection of trademarks and trade secrets are exceptions to the fundamental policy of free and open competition in business as well as in ideas. In balancing the interests associated with unfettered competition and the interest in protecting intellectual property rights, public policy has favored the latter for limited statutorily defined periods of time. Valid anti-competition and anti-disclosure agreements are also protective mechanisms that are facially inconsistent with unrestrained competition. Only through protection of these interests, however, will individuals and businesses be encouraged to pursue new productive ideas, the result of which will ultimately enure to the betterment of society. An intellectual property right that effectively results in a "monopoly" for the holder, does not diminish the protection afforded that right. "[L]oose application of the pejorative term 'monopoly' to legally sanctioned intellectual property rights reveals bias, not analysis." McCarthy on trademarks & Unfair Competition, 4th Ed.1996.

The defendants suggest that it is a given that Inflight is a monopoly. However, market share alone does not establish a per se monopoly. The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). The defendants have failed to allege any facts in support of the proposition that Inflight willfully acquired or maintained their market share, to the detriment of others. Rather, Inflight has historically relied upon oral contracts with the airlines and other

customer end users, a policy inconsistent with an intent to preclude potential competitors. Tr. 884, 1770. The gravamen of Inflight's action is the theft of trade secrets and the violation of non-competition clauses, not the maintenance of market share. Accordingly, defendants blanket labeling of Inflight as a monopoly is factually unsupported and legally insufficient to warrant relief.

## VI. THE BOND REQUIREMENT

Defendant Sergi and the MIF defendants object to the recommended amount of the bond to be posted in connection with granting the preliminary injunction. The defendants argue that the amount of $250,000 is grossly inadequate to protect against and secure the defendants from a wrongful injunction. The defendants base this argument on the fact that they have invested over $650,000 in MIF, Tr. 874–77, 1736, 1740, 1743, and have expended an additional $300,-000 in start up costs.[3] The defendants claim that the amount of the bond must reflect an amount that will indemnify them for their loss in the event the injunction was improper and will compensate them for the potential loss of revenue of any prospective airline contracts that they lose. *See, e.g., Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 80 F.R.D. 103 (S.D.N.Y.1978); *Kurt S. Adler, Inc. v. World Bazaars, Inc.*, 897 F.Supp. 92 (S.D.N.Y.1995). Defendant Sergi, therefore, requests that the amount of the bond be raised to $1,000,000, while the MIF defendants request a bond in the amount of $3,000,000.

Under Rule 65(c) of the Federal Rules of Civil Procedure, "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper." The language of Rule 65(c) confers broad discretion on the trial judge to set the amount of the bond, even to dispense with the bond requirement altogether. *See Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir.1996) (citation omitted); *Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 632 (2d Cir.1976).

In the present case, the defendants have provided the Court with no basis to impose a $1,000,000 bond, much less a bond in the amount of $3,000,000. Defendants' asserted loss of revenue of potential airline contracts they would have won or that they will somehow lose their entire investment if they comply with the terms of the injunctive is speculative at best. The plaintiffs, on the other hand, have presented evidence that they face likely financial peril as a result of the conduct that is now to be enjoined. Tr. 382, 383, 384, 386, 389, 1670. To place a bond amount that would further threaten their commercial viability may indeed obviate the need for this injunction. Accordingly, the Court finds that the Magistrate's recommendation of a $250,000 bond is fair and adequate to protect the interests of the defendants pending resolution of these matters after a trial on the merits.

## VII. THE SCOPE OF THE INJUNCTION

The MIF defendants object to the inclusion in the R & R of the language "and others" insofar as defendants are enjoined and restrained from "carrying on or engaging in any business which obtains magazines and newspapers, which binds such magazines into covers and distributes such magazines and newspapers to airlines and others," because plaintiffs have made no claim "that there is any other business or that defendants have ever been in any other business other than distributing magazines and newspapers to airlines."

Although the plaintiffs have not alleged that the defendants have distributed or contracted to distribute magazines to customers other than airlines, Inflight describes its business as "supplying these magazines and newspapers to airlines, Amtrak and certain other clients around the world," Pl.Compl. at ¶ 16, and to the extent MIF has been enjoined from distributing magazines to airlines for infringing upon Inflight's trade secrets through the use of the modified machines, the binding process and the information contained in the proposals and contracts, it necessarily follows that those same infringe-

---

**3.** Citations to the transcript provided in Sergi    Memorandum, at 20.

ments preclude MIF from distributing to others.

## CONCLUSION

For the foregoing reasons, the Court adopts in its entirety the November 10, 1997 Report and Recommendation of Magistrate Judge Michael Orenstein and orders as follows: first, that the plaintiffs post and maintain a bond in the amount of $250,000 and second, that the defendants Magazines In-Flight, LLC, Magazines Inflight, Inc., Marc Passarelli, Stephen Sergi, James Newton, Jody Dykstra, Elise Antonelli, Scott T. Guido, Edgar Escobar, Elvis Bran and Jan (or John) Kuliwoski, their agents, employees, attorneys or successors or anyone in active concert or participation with them who shall receive actual notice are enjoined and restrained from:

(A) carrying on in any business which obtains magazines and newspapers, which binds such magazines into covers and distributes such magazines and newspapers to airlines and others; and

(B) using any of plaintiffs' trade secrets, proprietary information or other confidential data, examples of which are set forth in Magistrate Orenstein's confidential appendix to his report and recommendation; and

(C) using a logo in the shape of a globe or sphere with an airplane circling or crossing such globe sphere; and

(D) stating in any publication in any such manner so as to imply that defendants or defendant business entities are the successor to or affiliated with Inflight Newspapers, Inc. or Inflight Advertising, Inc.

(E) using the name Magazines–Inflight.

SO ORDERED.